IN THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

NOV 2 8 2005 *rg*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JOHN M., by his Parents and Next Friends, CHRISTINE M. AND MICHAEL M., and CHRISTINE M. and MICHAEL M., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BOARD OF EDUCATION OF EVANSTON TOWNSHIP HIGH SCHOOL DISTRICT 202, EVANSTON TOWNSHIP HIGH SCHOOL DISTRICT 202; and Dr. ALLAN ALSON, its Superintendent, sued in his Official Capacity, | ) ) ) ) ) ) |
| Defendants. | ) ) |

No.     JUDGE HOLDERMAN

**05C 6720**

MAGISTRATE JUDGE VALDEZ

## COMPLAINT

### INTRODUCTION

1.     Plaintiffs, a minor child with disabilities and his parents, seek relief under the Individuals With Disabilities Education Act ("IDEA") and its amended form, the Individuals With Disabilities Education Improvement Act of 2004 (Public Law 108-446 ("IDEIA"), 20 U.S.C. Section 1400 *et seq.,* and the Illinois School Code for violations of their right to a free, appropriate public education in the least restrictive environment. Plaintiffs appeal from an administrative, due process decision concerning John M.'s special education that was rendered on October 28, 2005 by Impartial Hearing Officer James Wolter after a five-day hearing. His due process decision is attached and incorporated herein as Exhibit A.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to 28 U.S.C. 1331 and 20 U.S.C. 1415(i)(2).

1

3.     Venue is properly situated in this Court because the acts complained of occurred in and the parties reside in or do business in the Northern District of Illinois.

## PARTIES

4.     JOHN M., is a 15-year-old boy with Down Syndrome who lives with his parents, younger brother and older sister in Evanston, Illinois. JOHN is a freshman attending Evanston Township High School, a public high school in Evanston. He is a child with a disability within the meaning of the IDEA, IDEIA, and Illinois law. At all times relevant herein, he has received most of his instruction in the regular classroom with non-disabled peers.

5.     Christine M. and Michael M. are John's mother and father. They are U.S. citizens and reside in Evanston with John, within the boundaries and jurisdiction of defendant's school district.

6.     Evanston Township High School District 202 ("District 202") is the body politic providing regular education, special education and related services to children who reside within district boundaries, and the Board of Education of Evanston Township High School District 202 is its governing board. Dr. Allan Alson is the Superintendent of District 202. He is sued in his official capacity.

7.     Defendants receive federal funds under the IDEA and IDEIA and are bound by its requirements.

## STATUTORY ENTITLEMENT

8.     The IDEA was amended by Congress in 2004, with relevant portions of the new IDEIA taking effect on July 1, 2005. Plaintiffs challenge the individualized education program ("IEP") drafted by Defendants prior to July, 2005, and Plaintiffs filed their demand for due

2

process to challenge that IEP prior to July, 2005. The pre-hearing conference and other administrative matters leading to the due process hearing began before the effective date of the IDEIA, and concluded after its effective date. Plaintiffs assert that they are entitled to relief regardless of which version of the statute is applied.

9. Final regulations have not been promulgated for the IDEIA. The IDEA and its implementing regulations entitle all children with disabilities in the United States to a free, appropriate public education ("FAPE"), including instruction that is individually tailored to meet the child's special needs. 34 C.F.R. 300.13. Once the child's needs are determined, the school district staff and the child's parents form a team to draft the child's "Individualized Education Program ("IEP"). Membership on the IEP team is prescribed by law and implementing regulations. 34 C.F.R. 300.344.

10. The IDEA, IDEIA, and Illinois law regulate the content and process of drafting the IEP. 34 C.F.R. 300.340-347. The IEP must include a statement of how the child's progress toward annual goals will be measured, and how parents will be informed of the child's progress toward those annual goals and whether that progress is sufficient to enable the child to achieve those annual goals by the end of the year, 34 C.F.R. 300.347(a)(7). The school district must determine on the IEP whether the child will participate in district-wide assessments of student achievement, whether the child will need modifications in the administration of the assessments, and, if the child will not participate in those assessments, a statement of why that assessment is not appropriate, and a statement of how the child will be assessed alternately, 20 U.S.C.1414d(1)(A)(v)I and II; and (IDEIA) 20 U.S.C. 1414(d)(1)(A)(VI). The IEP must be in effect at the beginning of each school year. 34 C.F.R.300.342, and is the formal, written offer of

3

services to parents.

11.     Students with disabilities like John must be educated in the least restrictive

environment, meaning the environment in which they can receive appropriate educational benefit

with the least possible restriction of their interaction with non-disabled classmates. 20 U.S.C.

1412(a)5(A); 34 CFR 300.550-552. The IDEA and IDEIA each provide that "to the maximum

extent appropriate" children with disabilities must be educated with children who are not

disabled, and that removal of children with disabilities from the regular educational environment

can occur *only* when "the nature or severity of the disability of a child is such that education in

regular classes with the use of supplementary aids and services cannot be achieved

satisfactorily," 20 U.S.C. 1412(a)(5).

12.     The IEP also must provide "related services" as needed by the child with

disabilities to benefit from his special education. These include such services as speech and

language therapy, social work services, occupational therapy, and physical therapy. 34 C.F.R.

300.24.

13. The IEP also must specify the program modifications, supplementary aids and

services, and support for school personnel needed for the child to advance appropriately toward

achieving annual goals and to be involved and progress in the general curriculum. 34 C.F.R.

300.347. These include supports provided to the child in regular education classes or other

education-related settings to enable children with disabilities to be educated with non-disabled

children to the maximum extent appropriate in accordance with the least restrictive environment

provisions of the IDEA and IDEIA. The level of these supports is to be determined by the IEP

team based upon the child's needs, and the frequency, location and duration of those services

must be specified in the IEP. 20 U.S.C. 1414(d)(1)(A)(i)(IV) and (VII).

14.     The IDEA, IDEIA, and Illinois law provide parents and school districts the right to request an impartial due process hearing if they disagree about any matter related to the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child. 20 U.S.C. 1415(b)(6), (d)(2)(j) and (i)(2). The procedures for due process hearings are established by the Illinois School Code and the Illinois Administrative Code. 105 ILCS 5/14-8.02a(g). During the pendency of any proceedings, the IDEA and IDEIA provide that the child will "stay-put" in the then-current educational placement. 20 U.S.C. 1415(j). Any party aggrieved by the final written decision of the hearing officer has the right to commence a civil action with respect to the issues presented at hearing within 120 days after a copy of the decision is mailed to the party. 105 ILCS 5/14-8.02a(i). Filing of this appeal is timely.

## FACTS

15.     John has Down Syndrome, an impairment that adversely affects his communication, learning, social-emotional education and growth, his relationship with classmates, and at times his behavior. He has motor-planning problems that affect his speech, frustrating his ability to express himself and impeding conversation with classmates.

16.     John attended middle school in Evanston for grades six through eight. The school was operated by Evanston Community Consolidated School District 65, the elementary school district in Evanston, whose students generally graduate to attend Defendants' high school. John was educated there primarily in the regular classroom, with the assistance of an aide. In eighth grade, his IEP included supplementary services by a special education teacher who co-taught John's regular education classes in Reading, Language Arts, and Math. This co-teaching model,

5

which had been used since sixth grade, allowed a special education teacher to work with a regular education teacher to differentiate the general-curriculum instruction for John during these classes, to modify assignments for him, and to identify areas of need that could be remediated immediately inside the regular classroom, before bad habits were formed. The co-teaching model also provided the special education teacher with firsthand information about areas of the general curriculum for which John needed follow-up instruction in the resource room. The IEP entitled John to 200 minutes per week of this co-teaching by the special education teacher in each of those three classes, totaling 600 minutes per week, plus 200 minutes per week of resource-room instruction by the special education teacher.

17.    District 65 addressed John's social and speech deficits in part with a "Circle of Friends" program at lunchtime that included students with whom he ate lunch and interacted every day. Once a week, a social worker and speech therapist assisted John's social and conversational interactions with this group of students whom he saw regularly, socialized with and felt comfortable with. The goal was to increase John's ability to converse and be part of a group in a natural setting for children, using interactions of his own prompting rather than interactions that were demanded of him, and to experience forming relationships. John progressed in these abilities during his eighth-grade year because of this programming, and his regular classroom teacher and his parents noticed the gains outside of the lunchtime program.

18.    John also developed age-appropriate interests and social-emotional progress by participating in the regular classroom. By the end of eighth grade, John was described by his physical education teacher as having a "gung ho" attitude toward class, and that he was a "much improved athlete" who was an excellent shooter in basketball and had a baseball swing that he

6

used as a model for the class. John was welcomed into impromptu games in the schoolyard. He had a strong interest in sports, typical of 14-year-old boys. He had a perfect or near perfect attendance record at school, participated in band, and was described by District 65 staff as "charismatic." John's teachers and therapists recognized John's social and speech programming to be a major part of his education. However, John also progressed academically, learning a meaningful portion of the general curriculum in his regular education classes.

19. In May, 2005, the Illinois State Board of Education served Defendants with its "Special Education Compliance Monitoring Review Report," which assessed the school district's special education programs from several different compliance perspectives. The ISBE found that Defendants were out of compliance with IDEA's least restrictive environment provisions, and required corrective action that included reviewing students with disabilities' access to the general education classroom, specifically noting "co-teaching" as an area of review.

20. From February, 2005 through May, 2005, John's parents met with Defendants' staff in a series of IEP meetings to draft John's educational program for his freshman year at the high school. District 65 representatives attended the first two of those meetings, and described John's educational progress to date, and his inclusive educational program. Defendants had never evaluated or taught John, and only two staff members had ever seen John. At that first meeting, and thereafter, Defendants' special education director and staff suggested that John belonged in a special education program rather than the regular classroom, demanded information about his IQ, and asserted that he could not attend general education classes because the general curriculum would have to be modified for him too drastically.

21. During those meetings, Defendants' representatives refused to provide co-teaching

7

in the regular classroom for John, stating Defendants' policy did not provide for special education instruction inside of regular classrooms. Defendants offer only a resource-room model for students with disabilities attending regular classes, and do not offer a placement option that includes co-teaching assistance. Defendants' staff also asserted that Defendants did not use their resource classrooms for instructional purposes regarding the general curriculum or to achieve IEP goals. Defendants' staff refused to provide the "Circle of Friends" social program for John, instead placing him in a drama-therapy program with 30 students that meets three times a month. The IEP reduced his speech therapy from 160 minutes of direct service per week to 86 minutes of service per week. They reduced his entitlement to assistance from the special education teacher from 600 minutes per week to zero, refusing to write the number of support minutes into the IEP.

22. At the final IEP meeting on May 19, 2005, Defendants' staff, including its English and History department representatives, refused to place John into regular classes in English and History, recommending special education placements for those classes. After the parents did not agree, they recommended and placed John in a two-period remedial reading class instead. The class was new and hadn't been used at the high school before. It used a software program and computer-led instruction. The IEP team also refused to place John in a regular Physical Education class, slotting him for a special gym class instead.

23. John's parents filed a due process demand within 10 days of the IEP meeting in order to preserve their right to the "stay-put" provision of the IDEA. The ISBE appointed the hearing officer, a non-attorney who formerly had been a special education administrator.

24. The parties proceeded to hearing on September 12, 14 and 16, and October 19 and 20, 2005. They presented testimony by 27 witnesses, and hundreds of pages of documentary

8

evidence. John's parents agreed to the school district's single issue - its request to perform a functional analysis of John.

For their hearing issues, the parents sought placement for John in the regular education classes in History, English, and Physical Education; an addition to the IEP to determine how he would be graded in his regular education classes, including whether or how he would take common assessments that are required of all students in the district; additional support for his regular-classroom education including co-teaching, or, in the alternative, consultation minutes of service by the special education teacher; an additional 43 minutes per week of consultation time by the social worker and speech therapist; the "Circle of Friends" program to facilitate and promote John's ability to interact with peers in a natural setting; 43 minutes per week of additional direct social work service to facilitate that program; an addition to the IEP of a list of accommodations for use by regular education teachers; designation of the resource class as being for instruction to accomplish IEP goals using the general curriculum from John's regular classes; and an additional 43 minutes per week of speech therapy to work on expressive language in a natural setting.

25.    Prior to the hearing, Defendants defended the IEP as written. At the hearing, they asserted that they were providing 43 minutes per week of consultative services by the social worker, 43 minutes per week of consultative services by the speech therapist, and 215 minutes per week of consultative services by the special education teacher, none of which had been written into the IEP. The Hearing Officer rendered his decision ruling against Plaintiffs on October 28, 2005. The decision is attached hereto as Exhibit A. Plaintiffs filed this action appealing that decision, and ask the Court to hear additional evidence pursuant to 20 U.S.C.

9

1415i(2)(c)(ii) (previously 1415i(2)(B).

## GROUNDS FOR REVERSAL

26.     The hearing officer's decision is contrary to the weight of the evidence and is

based upon findings that demonstrate error, bias, and double-standards of scrutiny that ignore,

distort, or fail to give due weight to substantial credible evidence from the elementary school

staff and the Plaintiffs' other witnesses, who were knowledgeable about John's needs, while

accepting evidence that is not credible or admissible on behalf of Defendants. The hearing officer

committed reversible error in the following issues, which are listed in Exhibit A, pages 3-4:

      a.     <u>Issues 1, 3, and 5</u>. The hearing officer unfairly and uniformly discounted testimony by all of the highly qualified elementary school providers who testified on behalf of the parents that the elementary program produced benefits for John; he claimed that they lacked objective criteria, charting, or formal observation in support of their opinions, while ignoring their qualifications and the detailed data and expert opinion that they provided about John's three-year experience at the middle school;

      b.     <u>Issues 1, 3, and 5</u>. While setting an artificially high standard for according weight to testimony by the Plaintiffs' witnesses, and quarreling unreasonably with that testimony, the hearing officer accepted without objective data and without critical inquiry the unsupported statements by Defendants' staff, who by and large had never seen John prior to drafting his individualized educational program. This includes but is not limited to: Issue 1. Accepting unsupported statements about a new computer-assisted

10

reading program, "Reading 180," that had never been used by Defendants and was so new that it was not listed in the high school's program handbook. Defendants presented no witnesses who taught or would teach the two-period reading class, no objective data that it had been used elsewhere to assist students with John's disabilities, and no testimony that it was suited to John's individualized needs based upon factors such as his deficits in auditory processing. The hearing officer, without basis in the record, found that the quality of services in the untested reading program was significantly greater than John would receive in English and History classes.

c.     Issue 3. Accepting the high school special education director's assertion that a commonly used methodology, co-teaching, is not effective or cannot be used at the high school, while wrongfully striking Plaintiffs' duly proffered evidence that the Illinois State Board of Education had found Defendants to be out of compliance with the least restrictive environment portion of the IDEA and ordered Defendants to consider co-teaching as a way to include students with disabilities in the regular classroom, and further ignoring evidence from the elementary school staff that co-teaching had been effective with John, and evidence from the parents' educational consultant that the technique was frequently and effectively used in high schools like Defendants'.

d.     Issue 5. Accepting and highlighting the High School Social Worker/Lead

11

Teacher's unsupported assertion, lacking any form of data, that to some
unknown degree and frequency, students in the "WTTW" social program
offered by Defendants, although not scheduled to be together except for
three times per month, in fact meet socially as peers outside of the
program. The hearing officer used this assertion to equate the high
school's program with the grade school's, in which the social group met
together daily, and to find that the WTTW program therefore was
reasonably calculated to provide a meaningful benefit as the sole method
of meeting John's social-emotional goal of forming relationships with
classmates.

e.  Issue 5.  Ignoring testimony by the grade school speech therapist and social
worker that identified John's need to practice "spontaneous speech" prompted by
himself, that children with John's motor planning problem with speech tend to
shut down when speech is demanded of them, and that the "Circle of Friends"
program allowed him to choose speech in a small group of approximately eight
students with whom he met regularly, socialized with regularly, and felt
comfortable, approximating any natural social circle. Further, the hearing officer
unreasonably attacked the students who volunteered for the "Circle of Friends"
program as being unfit models, and ignored testimony that John had formed
friendships with them, while ignoring testimony that the group of 30 students who
participate in the high school's WTTW program include approximately 15
students who had been identified as lacking social skills and presumably needing

12

drama therapy, and that the 15 students who had been selected as helpers with this program were not selected to form relationships with John but rather to help during the three-times-per-month drama exercises.

f. Issues 1 and 3. In assessing the school district's position that John should not be placed in regular education English, History, and Physical Education, the hearing officer distorted testimony by the elementary school staff regarding John's program in regular education classes, and ignored testimony by John's case manager and regular classroom teacher, to reach the inaccurate finding that John was not expected to learn from the general curriculum in middle school, but rather was merely supposed to be "exposed" to it. He wrongfully sustained an objection to the English teacher's describing how she would teach "Romeo and Juliet" to John, although Defendants asserted during the IEP process and the due process hearing that John could not learn from the high school's general curriculum in English class. Further, he exaggerated the frequency with which John was removed from the regular classroom during the day to work on material individually; and found inconsistency that did not exist in the case manager's testimony about the use and benefits of co-teaching.

g. Issue 1. In finding that it would be "foolhardy" to retain John in the regular physical education class as requested by John's parents, the hearing officer ignored the testimony of three physical education teachers who had worked with John during his eighth-grade school year and during the summer after graduation from middle school, and the testimony of his father, who is active with John's

13

physical education outside of school, who all testified that he participates actively and safely in group sports and physical activities, and can be included in those activities with modifications that do not unreasonably disrupt the activity for the other students. In discounting their testimony, the hearing officer mistakenly found that John had been pulled out of physical education class to receive physical therapy twice a week rather than the actual allotment of twice a month. The hearing officer contributed this point to the defense by misreading an abbreviation on John's IEP that clearly states that John received 80 "mpm," or minutes per month, of physical therapy. The testimony correctly indicated 80 minutes per month, and Defendants never asserted otherwise. The hearing officer misread the IEP on his own initiative and demonstrated his willingness to ignore testimony in search of points for the defense.

h.     Issue 1. The hearing officer granted "deference" to the opinion of Defendants' adaptive physical education teacher, whom he termed the "on-site expert," instead of to the elementary school district's adaptive or regular education teachers who had worked with John for three years, although he observed John for approximately 10 minutes during class time that did not include group activity, based his opinion primarily on his view that John would not be safe in a regular class, yet had no reports of injury during John's physical education experience in the regular classroom.

i.     Issues 1, 3, and 5. The hearing officer found, without evidentiary basis, that Defendants exercised judgment about choosing a methodology about these issues,

14

when, in fact, Defendants admittedly don't provide co-teaching or a "Circle of Friends" program for any students at any time; have a firm policy of enrolling all incoming freshman in reading classes if they fall below a certain reading level on a standardized test; and did not exercise judgment in choosing a methodology for John based upon his individual needs but rather slotted him into their existing programs after refusing to place him in regular education English and History.

j.      Issue 1. The hearing officer ignored testimony supporting the need for co-teaching in John's core academic classes, including testimony demonstrating the lack of experience of his regular education teachers in modifying instruction for students with disabilities (including the suggestion by his high school English teacher that the special education teacher might replicate for John, in his resource room, what she taught in the regular classroom). He further ignored testimony about John's success with the co-teaching model in grade school, and that the curriculum in high school would become more difficult, again supporting the need for this direct support from a special educator.

k.      Issues 1-8. The hearing officer demonstrated hostility toward the Plaintiffs, and demonstrated advocacy rather than objectivity by quarreling with John's mother's testimony; asserting inconsistencies in her position that did not exist; finding fault with the parents - rather than crediting their right to challenge important educational decisions about their son - for challenging Defendants' untested reading program and WTTW program without trying them (while not finding similar fault for Defendants' refusal, before they'd ever seen John, to schedule

15

him in the ordinary sequence of freshman English, History, and Physical
Education classes, or to try teaching methods that had been successful for John in
the past); falsely accusing them of blocking necessary information from being
transmitted from the grade school district, and then noting that they hadn't
rebutted the charge, although this allegation of blocking information provided no
defense and hadn't been asserted as a defense, was based in part on hearsay, had
no specifics about information that was needed, and was not an issue at the due
process hearing.

Further, the hearing officer overruled Plaintiffs' objection and allowed irrelevant
testimony about the length of IEP meetings during grade school, solely to
characterize the Plaintiffs as difficult, while sustaining Defendants' relevancy
objection when Plaintiffs offered testimony about Defendants' inefficiency as
reasons for the number of high school IEP meetings that occurred.

28. The hearing officer's decision should be overturned because of the following
reversible errors in the manner in which he conducted the pre-hearing conference and due
process hearing, including the following departures from objectivity and appropriate, standard
legal practice:

a.      The Hearing Officer formulated the issues in a manner that unfairly penalized the
        moving party, and abused his discretion by failing to order relief that was
        demonstrated to be necessary by evidence adduced at the hearing. The hearing
        officer took the position throughout these proceedings that Plaintiffs must specify
        at the pre-hearing conference the exact amount of consultative support needed

16

from the high school special education teacher by John's core classroom teachers, even though that amount typically is determined at an IEP meeting with due consideration for the experience level and needs of regular classroom teachers. Plaintiffs had no access to that information prior to taking testimony from those teachers at the hearing, yet the hearing officer insisted that Plaintiffs were entitled to *no* support of this nature for their child if they did not persuade him to order the exact amount requested at the pre-hearing conference. Further, in the pre-hearing conference he stated that Plaintiffs could amend the amount requested at or prior to the time for disclosure of documents, which Plaintiffs did, but the hearing officer nevertheless struck the amendment as being untimely.

b.  The hearing officer refused to allow follow-up questioning of a witness by the parties in response to the hearing officer's questioning, although his questions created false impressions and raised new matters.

c.  The hearing officer assigned the burden of proof to the Plaintiffs, and the burden of presenting their case first, contrary to Illinois law that places the burden on the school district at the administrative level, 105 ILCS 5/14-8.02a(g).

d.  The hearing officer refused to allow Plaintiffs' rebuttal testimony. Because the parents had presented their case first, this allowed school district witnesses to raise matters that had not been addressed previously, without possible response by the parents. One such matter was the false insinuation thereafter raised by district witnesses - and adopted by the hearing officer as fact - that John's parents were doing his homework for him to inflate his grades; another was the false claim that

17

the parents "desired" John to attend the high school for more than four years.

e.   The hearing officer made comments during the hearing and pre-hearing conference that were designed to assist the school district by inviting and specifying the type of testimony needed for its defense, and made comments that demonstrated that he had reached a decision about an issue or an event prior to hearing all of the testimony on that point.

f.   The hearing officer interrupted and prevented a complete cross-examination of the special education director as to the district's decision-making and placement options during the IEP process.

g.   The hearing officer allowed irrelevant and hearsay testimony, adduced over Plaintiffs' objection, while erroneously sustaining objections to valid evidence submitted by Plaintiffs, including but not limited to evidence that the Illinois State Board of Education had ordered Defendants to consider co-teaching as a method of curing their non-compliance with the least-restrictive-environment mandate of the IDEA; and testimony by John's elementary school teacher about how she would teach "Romeo and Juliet" to John.

29.   The due process decision should be overturned because of the following legal errors which the hearing officer committed in reaching that decision:

Hearing Officer Issues 1 through 8

a.   The hearing officer erred by failing to follow Illinois law which requires the school district to "present evidence that the special education needs of the child have been appropriately identified and that the special education program and

18

related services proposed to meet the needs of the child are adequate, appropriate and available," 105 ILCS 5/14-8.02a(g). Specifically:

1. The hearing officer failed to require, and Defendants failed to provide, evidence that the changes in John's program from eighth grade to high school resulted from valid changes in how his needs were identified, when Defendants performed no meaningful evaluation of John's educational needs, and failed to include the elementary school staff, who were knowledgeable about John's needs, in determinations about his educational program.

2. The hearing officer failed to require, and Defendants failed to provide, evidence that the changes in John's program from eighth grade to high school were individualized to meet John's unique needs, including but not limited to the switch from a co-teaching model to one involving no instruction in the regular classroom by the special education teacher, the IEP's reduction in speech therapy services, the failure to provide social-emotional programming in a natural setting with a group of students who met regularly with John, and the switch to a program that focused on psychological therapy techniques through drama and performance rather than on speech that John chose during natural conversations with well-known classmates.

Hearing Officer Issue No. 1

b.  The hearing officer failed to accord due weight to the testimony of Plaintiffs' witnesses, and the manifest weight of the evidence demonstrated that John should be placed in regular classes with supplementary aids and services;

19

c.  The hearing officer failed to apply the correct legal standard, failing to determine whether John could be satisfactorily educated in the regular classroom in English, History, and Physical Education, with appropriate supplementary aids and services and supports for school personnel, as required by the least restrictive environment mandate of the IDEA and IDEIA;

d.  The hearing officer failed to apply Illinois regulations setting forth Defendants' duty in choosing a placement for John, 23 Ill. Admin. Code 226.240, including that "the child shall not be removed from an age-appropriate regular classroom solely because of needed modifications in the general curriculum," and that consideration shall be given to the possible harmful effect of a placement on the child (including the addition of a fifth year to John's attendance at high school and removal from the four-year track for graduation by delaying his completion of the English requirement, and removal from the normal sequence of freshman classes in which he might form relationships with classmates more readily).

e.  The hearing officer erred in finding that the least-restrictive-environment issue is "moot" and in finding that the reading class is a regular education classroom, when it is a general remedial classroom and therefore is not a regular education classroom pursuant to 23 Ill. Admin. Code 226.730; and further erred by failing to find that removing John from the natural sequence of freshman classes in English and History is a violation of the least restrictive environment provision.

f.  The hearing officer erred by failing to consider whether John's reading goals could be achieved in the regular classroom with appropriate supports;

20

g.      The hearing officer erred by failing to place the burden on the school district to demonstrate that its untested reading program was individualized to meet John's needs, inasmuch as Defendants admittedly did not consider the effect of John's auditory processing problems on the computer-led instructional portions of the program, did not consider his cognitive deficits, that he has had specialized instruction in reading his entire school career, that he reads well given his learning deficits, and that Defendants slotted him for the two-period reading class only after asserting that he could not be placed in regular English and History classes because the general curriculum would have to be modified too drastically.

h.      The hearing officer erred on the physical education issue by granting deference to a school district witness who was not familiar with the student or his abilities, and whose opinion was based upon paternalism rather than any safety concern stemming from experience, and whose opinion was contrary to the evidence from John's father and three physical education teachers who had extensive experience with John.

i.      The hearing officer erred in the physical education issue by approving a placement that would remove John from the regular classroom without any evidence that the high school staff had provided regular-classroom supports to which he was entitled by his IEP, in the form of service by an adaptive physical education teacher and physical therapist, or that Defendants had taken any steps to achieve a satisfactory education in that setting for John.

j.      The hearing officer erred by failing to consider, or by discounting without

21

evidentiary basis, the social-emotional and speech benefits that John could obtain
through a satisfactory education in the regular classrooms in English, History, and
physical education.

## Hearing Officer Issue 2

k.  The hearing officer erred by finding the issue to be "moot."

l.  The hearing officer erred by failing to consider and find that Defendants violated
20 U.S.C. 1412 and 1414, by failing to state in the IEP whether John would be
responsible for district-wide "common assessments" that are used in grading his
regular education classes, and by failing to specify program modifications,
supplementary aids and services, and supports for school personnel to guide his
regular classroom teachers in grading; and further, that they violated Illinois law
by failing to have a continuum of placement options that included modified
grading in the regular classroom, 23 Ill. Admin. Code 226.300a(4).

m.  The hearing officer abused his discretion by finding that John's initial grades were
vague and meaningless, while declining to order Defendants to convene an IEP
meeting to consider meaningful criteria for grading John.

## Hearing Officer Issue 3

n.  The hearing officer erred by finding the co-teaching issue to be "moot."

o.  The hearing officer erred by applying the wrong legal standard in determining
whether co-teaching should be ordered. He stated that co-teaching would be
ordered if it was the *only* method that would work, when, in the absence of an
appropriate offer of support from the school district, the hearing officer was bound

22

to accept the uncontested evidence from the elementary school staff that co-teaching had produced a satisfactory education for John. The hearing officer further erred by construing the sufficiency of the IEP to include support that was not provided for in the IEP.

p.  The hearing officer wrongfully applied caselaw concerning the school district's discretion based upon exercises of judgment about methodology, when the evidence demonstrated that Defendants did not exercise judgment in rejecting co-teaching as a method for John.

q.  The hearing officer erred in finding that Defendants had complied with John's parents' procedural right to participate in the IEP process in a meaningful way regarding the co-teaching issue, and should have found that Defendants had significantly impeded the parents' opportunity to participate in that decisionmaking process, because Defendants admittedly refused to consider co-teaching as a method of supporting John in the regular classroom.

r.  The hearing officer erred by failing to find that Defendants violated Illinois law by failing to have a continuum of placement options available to educate John in the regular classroom, including supplementary services in the form of itinerant, co-teaching instruction by the special education teacher, 23 Ill. Admin. Code 226.300a(6).

s.  The hearing officer erred by assigning the burden of proof on the co-teaching issue to the Plaintiffs and by manufacturing a standard of analysis that unfairly burdened them with demonstrating that his co-taught classes produced a

23

measurably different benefit from other classes, especially when those other
classes included instruction by teachers who participated in co-taught classes with
John, and had regularly scheduled team meetings with John's special education
teacher, other regular education teachers, and parent, features that are not present
in Defendants' program.

t.      The hearing officer erred by finding that Defendants' failure to provide for
supplementary aids and services in the IEP in the form of consultation by the
special education teacher was a "technical error" when the hearing officer
correctly found that this support was a significant part of John's educational
placement, and when the school district defended the IEP as written - without
consultative support by that teacher - until the hearing had begun, asserting that
Plaintiffs' request for support was not needed and that the IEP was sufficient as
written.

u.      The hearing officer exceeded his authority and abused his discretion by purporting
to determine "prevailing party" status on the issue of supplementary aids and
services. He further failed to apply the proper legal standard to this determination,
which standard would result in the parents prevailing on this contested issue in
which the hearing officer ordered relief that they had been seeking.

Hearing Officer Issue 4

v.      The hearing officer erred by finding that Defendants made merely a "technical
error" by failing to provide for 43 minutes per week of consultation by both a
social worker and speech therapist. In fact, Defendants defended the IEP as

24

written, without these consultative services, throughout the hearing and until the therapists testified to the need for the consultative services, and the parents prevailed on this issue because the hearing officer ordered relief that the parents had been seeking on this contested issue.

w. The hearing officer erred by failing to consider that Defendants' practice of failing to write essential parts of John's program into the IEP seriously infringes upon Plaintiffs' right to a free education for John, and to their statutory entitlement to have the school district's offer of services in writing, in the IEP, so that they can judge whether to use their statutory due process rights under 20 U.S.C. 1415.

Hearing Officer Issue 5

x. The hearing officer erred by finding that John's placement in the WTTW program was a question of methodology within Defendants' discretion, when 1) the school district did not exercise judgment concerning the choice of the program, but rather refused to consider any program other than its canned program, 2) the WTTW program is not reasonably calculated to achieve an educational benefit for John, but rather is reasonably calculated to provide no benefit or a trivial benefit toward meeting his IEP goals, inasmuch as it meets only three times per month, John has no reasonable expectation of regularly meeting with the children in the program for the purpose of forming relationships and developing his speech and social ability with them, and the program involves theatrical performance in a theater setting rather than natural conversation prompted by John in a natural setting with children with whom he is well acquainted and comfortable, 3) for the foregoing

25

reasons, the method chosen by the school district is not individualized to meet
John's needs and is not special education within the meaning of the IDEA and
IDEIA, 20 U.S.C. 1402(29).

Hearing Officer Issue 6

y.      The hearing officer erred by failing to find that the IEP team had approved the list
of accommodations that had been submitted by Plaintiffs, and that the special
education director thereafter had no authority to alter that list on her own, and had
no authority to choose a methodology different from the one already approved at
the IEP meeting.

z.      The hearing officer erred by finding that the IDEA does not require the list to be
attached to or listed on the IEP, when the list is written to assist regular education
teachers in educating John in the general curriculum and regular classroom and
therefore is a supplementary aid and service and support for school personnel that
is required to be listed on the IEP by 20 U.S.C. Section 614d(1)(A)(small i)(IV).

Hearing Officer Issue 7

aa.     The hearing officer erred by finding the resource-classroom issue to be "moot"
merely because the special education teacher agreed vaguely to do what the
parents had requested, when Defendants contested the issue until that teacher
testified, and Defendants had asserted during the IEP process, at the pre-hearing
conference, and during the due process hearing, that the resource class was not to
be used for instruction in the general curriculum or to achieve John's IEP goals.

bb.     The hearing officer erred by failing to enter an order reflecting that the resource

26

class is to be used to work on the general curriculum to accomplish John's IEP goals.

cc. The hearing officer erred by misapplying caselaw concerning the school district's right to choose methodology for the resource class, when Defendants have offered no other plan or service to work on general curriculum that John has difficulty with, and it is undisputed that John needs this remediation to supplement regular classroom instruction.

Hearing Officer Issue 8

dd. The hearing officer erred by failing to require Defendants to demonstrate that John's speech therapy could be reduced from 160 minutes per week in eighth grade to 86 minutes per week in high school based upon his current needs.

ee. The hearing officer erred by finding without factual basis that the parents rejected the WTTW drama therapy program offered by Defendants, when they merely stated that it was insufficient to meet John's social-emotional programming needs.

ff. The hearing officer erred by considering alleged speech therapy services that are not presented in the IEP, which is the formal written offer of services to the parents.

gg. The hearing officer erred by misinterpreting 20 U.S.C. 1414(a)(1(D)(i)(II) to mean that the parents can waive services that are not offered in the IEP.

hh. The hearing officer erred by considering and adopting Defendants' assertion of an offer of services outside of the IEP without any plan for how the therapist's time would be divided among the group of students at the WTTW program.

27

General Statement of Errors

    ii.    The Hearing Officer otherwise erred by misstating evidence, ignoring Plaintiffs'

evidence, changing or omitting portions of the issues raised by Plaintiffs, failing

to award the relief requested by Plaintiffs, and by characterizing as "technical" the

important relief that was awarded.

    30.  Defendants have failed to comply with the stay-put provision of the IDEA and

IDEIA during the pendency of the due process hearing and to date, by failing to comply with the

eighth-grade IEP's entitlement to occupational therapy, speech therapy, physical therapy, services

by an adaptive physical education teacher, and co-teaching services by the special education

teacher.

    WHEREFORE, the Plaintiffs, John M., Christine M. and Michael M., pray this

Honorable Court for an Order:

    A)    Reversing the specified parts of the due process decision;

    B)    Finding and declaring that defendants violated plaintiffs' right to a free,

appropriate public education in the least restrictive environment for the reasons stated herein;

    C)    Ordering that John should be enrolled and continue in the regular education

classes in English, History, and Physical Education, and finding and declaring that those classes

represent the least restrictive environment for John;

    D)    Ordering Defendants to convene an IEP meeting with all of his regular classroom

teachers and special education teachers and providers in attendance to determine, in compliance

with the IDEIA, whether John will be responsible for district-wide common assessments, and, if

so, what modifications are needed, and, if not, how John will be assessed alternately; further, to

determine guidelines for grading John in all of his regular education classes;

E)    Ordering Defendants to provide co-teaching by the special education teacher in John's core regular education classes, including English, History, Biology, and Algebra; or, in the alternative, if the Court does not Order co-teaching in these classes,

Ordering Defendants to amend the IEP to provide for 215 minutes per week of consultation time by the special education teacher with John's regular education teachers, and to specify and set aside regularly scheduled meeting times for this consultation with each of these teachers;

F)    Ordering Defendants to create a "Circle of Friends" program for John or other program that will allow him to work on forming relationships and engaging in conversations with classmates whom he sees frequently and regularly in a natural setting, and ordering Defendants to amend the IEP to provide for an additional 43 minutes per week of social work services and 43 minutes per week of speech therapy services to work on John's social-emotional goals and expressive language in that setting;

G)    Ordering Defendants to amend the IEP to adopt and attach the list of accommodations submitted by the parents as supplementary aids and services and support for school personnel for the 2005-2006 school year;

H)    Ordering Defendants to use John's time in resource room for working on the general curriculum and on his IEP goals;

I)    Finding and declaring that Plaintiffs are prevailing parties within the meaning of the IDEA and IDEIA;

J)    Ordering Defendants to comply with the "stay-put" provision during the pendency

29

of this proceeding, and Ordering them to provide compensatory education in the form of physical

therapy, occupational therapy, speech therapy, co-teaching time by the special education teacher

in the regular classroom, and adaptive physical education services in the regular classroom to

Plaintiffs for Defendants' violation of the stay-put provision of the IDEA and IDEIA, in an

amount equal to the period of deprivation;

K) Awarding reasonable attorney's fees and costs to John's parents;

L) Entering such other, further and different relief as to this Court seems just.

Respectfully submitted,

Attorney for the Plaintiffs

Charles F. Stone
Attorney for Plaintiffs
79 West Monroe, #810
Chicago, IL 60603
312-372-9220

30

IN THE MATTER OF:

## John M.
## Vs.
## Evanston Twp H S Dist 202
## ISBE Case Number 004568

### Procedural Background:

The parent requesting a due process hearing by way of a letter from her attorney dated May 27, 2005. The Illinois State Board of Education assigned the case to this hearing officer on June 21, 2005. Notice of the first pre-hearing conference was provided the parties on July 6, 2005 and the first pre-hearing conference was held on July 20, 2005 by teleconference. Subsequent pre-hearing conferences were held on July 20, 2005, August 2, 2005 and August 19, 2005. Pre-hearing conference reports were issued to the parties for each of the pre-hearing conferences. Additionally a pre-hearing conference report was issued on August 29, 2005 to reflect the Illinois State Board of Education decision to consolidate a new parent issue regarding the gender of the student's 1:1 instructional aide. When the district decided to accommodate the parent's request that the 1:1 instructional aide be a male rather than a female, the parent withdrew the gender issue from the hearing and another pre-hearing conference report was issued on August 31, 2005.

On September 6, 2005 the parent submitted another amendment to Issues 3(a) and 3(b) and Remedies (3) & (4) of the pre-hearing conference report. The issue and remedy pertain to the amount and type of special education consultative service the district would provide the student's regular education teachers. The district countered that it was providing consultative services and would stipulate to that effect on the student's 2005-2006 IEP but it did not want to restrict the time allocated to each area as requested by the parent. The parent did not accept the district's offer. The district objected to the changes because they did not occur 14-days prior to the due process hearing and put the district at a disadvantage in preparing for this due process hearing. The hearing officer reasoned the 14-day interval between completing the pre-hearing conference and starting the due process hearing was intended to insure all the issues, remedies, witnesses and evidence were known to the parties so that they could prepare their cases. This case had already had four pre-hearing conferences and two amendments prior to the parent's motion to amend. The parent's request to amend the issues and the remedies was not granted because it was not made 14-days prior to the start of the due process hearing.

At the conclusion of the 4th day of due process hearing, October 19, 2005, the parent submitted a copy of *Illinois Court Rules and Procedure 2005, Volume I, 5/2-617* to the hearing officer [Parent Exhibit B] and requested a reconsideration of the hearing officer's prior ruling denying the parent's request to amend the



1

remedies sought by the parent. The hearing officer's ruling on this motion to reconsider is addressed in the Discussion and Conclusion of Law section of this document.

The parties were unable to put their witnesses on within the time frame they had anticipated and requested two additional days of hearing. The request was granted. This resulted in an extension of the 45-day timeline for conducting due process hearing.

Notice of the due process hearing was sent to parties with each of the pre-hearing conference reports and a reminder of the due process hearing was sent to the parties on September 6, 2005. The due process hearing was held on September 12, 14, 16, and October 19 & 20, 2005.

On the first day of the due process hearing, September 12, 2005, the parent stated that they were no longer contesting the district's desire to conduct an analysis of the student's functional behavior as long as it was conducted with the parameters listed as Remedy 11 below and as long as they preserve their right to a due process hearing to resolve any disagreement with the findings of the analysis or subsequent behavior intervention plan.

Since the request for this due process hearing was filed prior to July 1, 2005 but pertained to the 2005-2006 IEP, which was to be implemented after July 1, 2005, the due process hearing was conducted in accordance with IDEA 1997 while the IDEA 2004 was applied to determine the appropriateness of the 2005-2006 IEP.

Legal counsel represented both parents and the high school district. Additionally, legal counsel was present for the testimony of elementary school district employees. It is noted that the elementary school district was not a party to this due process hearing. Neither the parent nor high school district objected to the elementary school district's legal counsel being present.

The district submitted 28 District Exhibits consisting of 413 pages into evidence. The parent submitted Parent Exhibits consisting of 828 pages into evidence submitted within the 5-day timeline for disclosures and Parent Exhibit B submitted at the close of the 4th day of the due process hearing.

The following witnesses presented testimony (by title – name omitted).
**DAY ONE September 12, 2005**
- Elementary School Principal
- Elementary School Assistant Principal/Science Teacher 7th Grade
- Case Manager/Special Education Teacher 8th Grade
- Reading/Language Arts/Social Studies Teacher 8th Grade
- Physical Education Teacher 6th Grade

**Day Two September 14, 2005**
- Elementary School Social Worker

- Elementary School Speech Language Therapist
- Physical Education Teacher 8th grade
- Elementary District Special Education Supervisor
- Elementary District Adaptive Physical Education Teacher
- Parent's Private Expert Witness/Advocate
- Student's Father

## Day Three September 16, 2005

- High School Social Studies Teacher
- High School English Teacher
- High School Algebra Teacher
- High School Social Worker
- High School Director of Special Education
- Student's Mother

## DAY FOUR October 19, 2005

- High School Physical Education Teacher
- High School Teacher Aide
- High School Special Education Teacher
- High School History Department Chairperson
- High School English Department Chairperson
- High School Psychologist
- High School Social Worker/Lead Teacher

## DAY FIVE October 20, 2005

- High School Biology Teacher
- High School Speech/Language Pathologist

The parent elected to have the due process hearing closed but as noted above allowed the elementary district's legal counsel to be present during the testimony of elementary school district personnel. The student was present for a portion of day 3 and day 4 of the due process hearing. Witnesses were sequestered and instructed not to discuss their testimony with other parties during the duration of the due process hearing.

The hearing officer has jurisdiction to hear this matter under Section 14.02(g) of the School Code, 34 CFR 300.506-509, and 23 Illinois Administrative Code 226 Subpart J. The parties were informed of their rights under Section 14.802 of the School Code, 34 CFR 300.506-509, and Illinois Administrative Code 226 Subpart G

## Issues Presented by the parent:

1. Whether the district's proposed special education placement in a two-period regular education reading class and adaptive physical education as opposed to a two-period English/history block and physical education in regular education classes, provides the student with a free appropriate education in the least restrictive environment.

3

2. Whether the district is required to specify the criteria that will be used to issue grades to the student for his courses in his 2005-2006 IEP.
3. Whether the student's 2005-2006 IEP provides sufficient supplementary aides and services, program modifications, and supports for school personnel to educate the student in the regular classroom using appropriate qualified personnel.
    a) Whether the district must provide a special education teacher to co-teach the student's regular education classes.
    b) Whether the district is required to provide and specify 172 minutes per day of consultative service from the special education teacher to the regular education teacher and stipulate, in the student's 2005-2006 IEP, the means by which the special education teacher will assist the regular education teacher modify assignments, assess student progress and preview instructional materials to discuss instructional techniques for those materials.
4. Whether the student requires an additional 43 minutes per week each of social work and speech/language consultative services to his regular education teachers.
5. Whether the district is required to implement the specific program, "Circle of Friends" requested by the parents to facilitate and promote the student's ability to interact with peers in a non-classroom setting with 43 minutes per week of direct social work service.
6. Whether the district is required to implement the list of accommodations provided by the parent, as opposed to the list developed by the district, in the student's 2005-2006 IEP.
7. Whether the district must use the student's special education resource class to provide instruction to accomplish the student's IEP goals using curriculum from the student's regular education classes.
8. Whether the district must provide the student with an additional 43 minutes of direct speech/language service per week to work on expressive language in a non-classroom setting.

**District Issues:**
1. Whether the district may conduct a new functional analysis of behavior and revise the behavior intervention plan, if appropriate, after the new school year (2005-2006) has begun.


**Remedy Sought:**
1. The parent desires the hearing officer to find that for this student a free appropriate public education in the least restrictive environment constitutes a two-period English/history class block and physical education in the regular education and to order the district to provide such as opposed to the two periods of reading in regular education and adaptive

physical education proposed by the district in the student's 2005-2006 IEP.

2. The parent desires the hearing officer order the district to specify, in the 2005-2006 IEP, the criteria by which grades will be issued to him for his courses.

3. The parent desires the hearing officer order the district to amend the 2005-2006 IEP to assign a special education teacher to co-teach the student's regular education classes.

4. The parent desires the hearing officer order the district to specify in the student's 2005-2006 IEP and to provide 172 minutes of consultative service per day from the special education teacher to the regular education teacher and specify, in the student's 2005-2006 IEP, the means by which the special education teacher will assist the regular education teacher modify assignments, assess student progress and preview instructional materials to discuss instructional techniques for those materials.

5. The parent desires the hearing officer order the district to amend the student's 2005-2006 IEP to specify and provide the student with an additional 43 minutes per week each of social work and speech/language consultative services to the student's regular education teachers.

6. The parent desires the hearing officer order the district to implement "Circle of Friends" with an additional 43 minutes per week of direct social work service to facilitate and promote the student's ability to interact with peers in a non-classroom setting

7. The parent desires the hearing officer order the district to implement the list of accommodations provided by the parent and include that specific list, as opposed to the list developed by the district, in the student's 2005-2006 IEP.

8. The parent desires the hearing officer order the district to use the student's special education resource class to provide instruction to accomplish the student's IEP goals using curriculum from the student's regular education classes

9. The parent desires the hearing officer order the district to provide the student with an additional 43 minutes of direct speech/language service per week to work on expressive language in a non-classroom setting.

10. The district desires the hearing officer find the student's 2005-2006 IEP is reasonably calculated to provide him with a free appropriate public education in the least restrictive environment.

11. The district desires the hearing officer order the district to commence an analysis of the student's functional behavior without parent consent in his new school no earlier than October 3, 2005 and to develop with the parents a behavior intervention plan no later than November 11, 2005 unless mutually agree upon by the parties.

5

**Findings of Fact:**

1. The student is a 15-year-old male from an English speaking home entering his first year of high school.
2. He is eligible for special education and related services under the criteria Multiple Disabilities [District Exhibit 24] related to Down Syndrome [Parent Exhibit page 6]. A current comprehensive case study evaluation does not exist for the student.
3. He resides in an area where the elementary school district and the high school district are separate and distinct governmental bodies. At the conclusion of the 2004-2005 school year, the student transferred from the elementary school district to the high school district.
4. There were 6 IEP team meetings, totaling more than 20 hours, to develop the 2005-2006 IEP and to facilitate the student's transfer to the high school district.
5. The parents agree with the goals of the high school district's 2005-2006 IEP but disagree with the amount and type of special education and related service the student is to receive.
6. The high school district implemented the student's 2004-2005 IEP from his transferring school in compliance with *IDEA 2004 Section 614(d)(2)(i)(I) and 34 CFR 300.514(a)* when the parents refused to accept the 2005-2006 IEP.
7. As indicated in the testimony below, the parents blocked the elementary school district from transferring the student's special education records to the high school district. That is in violation of *IDEA 2004 Section 614(d)(2)(c)(ii) and 34 CFR 99.3(a)(2)*.
8. The Elementary School Principal testified the student made academic and social progress while he attended the elementary school district. The student made friends with a group of other students. The student was in regular education classes that were co-taught by a regular education teacher and a special education teacher with a total of 26 students. The principal stated that he believes the student's elementary school district needs met IEP. He testified that the student participated in a trip to Springfield, Illinois. The student's father was one of the parent chaperones but the student required no special assistance. He stated the student was able to do more that other students with Down's Syndrome that he observed in another group visiting Springfield. The principal presented no objective criteria by which his conclusion could be verified and acknowledged that he did not know the ability level of the other students and was not inferring that ability of all students with Down's Syndrome were the same. The principal felt the student made progress while in the elementary school district but made no formal observations of the student nor did he chart the student's behavior or keep any other objective means documenting the student's progress. He acknowledged that he had not seen nor could he comment on the 2005-2006 IEP.
9. The Elementary School Assistant Principal/7th Grade Science Teacher taught the student science in 7th grade. The class was <u>not</u> co-taught but

the student had a 1:1 teaching assistant in class. The curriculum, instruction and grading were modified for the student via consultation with the parents. The student's report card would indicate that the student received a modified grade but the district had no written policy for modifying grades. The Elementary School Assistant Principal did not know what the grades on the student's report card meant. The 1:1 AIDE helped the student take notes, start, stay on and complete task by giving the student verbal prompts and assistance. Tests were modified for the student. He was tested on a limited number of concrete facts, which could be learned by rote, and he practiced prior to testing. He was given extended time to take tests and could complete them in the special education resource room. The student was seated close to the teacher. Students in that class represented a broad range of abilities. Some were able to excel in the full curriculum, others were able to learn most of the curriculum while the rest were not capable of learning even 50% of the 7th grade science curriculum. The expectation for the student was even more modest. He was not expected to learn the curriculum. The goal was to expose him to the curriculum rather than teach the curriculum to him. His science curriculum consisted of learning some basic concrete information (a fraction of that required of other students) that was contained in the general science curriculum. He was issued a grade as determined by the science teacher with input from the parent. The teacher was unable to say what the grade she issued to the student represented. The structure of the school enabled all 7th grade teachers to have the same planning period so that they could coordinate instruction for all 7th grade students. She felt the student made progress but made no formal observations of the student nor did she chart the student's behavior or keep any other objective means documenting the student's progress.

10. The Case Manager/8th Grade Special Education Teacher co-taught the 8th grade regular education math and reading/language arts that the student and other students on her caseload participated in. The student was also assigned to her for 5 resource periods per week but the student-received service from the occupational therapist for one of those periods each week. She did not co-teach the student's 8th grade science, social studies, art, band or physical education classes. She consulted with the regular education teacher who taught reading/language arts on a daily basis during their joint planning period. These consultations took the form of joint planning secessions for the entire class typical of co-taught courses rather consultation specific to and limited to the needs of the student in this hearing. The student's mother participated in the consultation every second Friday. These consultations consisted of negotiating back and forth with the parent the modifications that would be made to the curriculum, instruction and grading. The regular education teacher issued grades to the student. The SE8 was not consulted by the regular education concerning the issuance of grades. The SE8 consulted with the math teacher informally after the class they co-taught. She had no formal

7

consultation time scheduled with the science, social studies, art, band and physical education teachers but consulted on an as needed basis by email and in person for 10 to 15 minutes per day. In addition to assisting the regular education co-teacher modify curriculum, instruction and grading, she assisted the student by helping get started on tasks and stay on task with the use of verbal prompts. She would pre-teach material to be covered in class and assist the student in producing written responses by discussing what the required response was. She pulled him out of regular education class when he required more practice and to complete assignments when the regular education students moved on to more complex tasks. She testified that each resource 40-minute period consisted of 10 to 15-minutes of keyboarding. The rest of the time was spent practicing reading to get the main idea as well as practicing math skills that the student was missing. The student was also provided books on tape. She testified that the student derived educational benefit from his elementary school experience but made no formal observations of the student nor did she chart the student's behavior or keep any other objective means documenting the student's progress. She participated in the high school IEP meetings and provided information regarding his performance [District Exhibit 18] but was not in a position to evaluate the high school education program or the 2005-2006 IEP.

11. The 8th Grade Teacher of Reading/Language Arts and Social Studies testified that the student had derived educational benefit from his 8th grade program. He interacted with other students. He gave verbal reports. She stated that she thought a special education teacher was required as a co-teacher in reading/language arts to assist in modifying curriculum and instruction. She testified that the special education teacher provided service of refocusing the student and keeping him on task. She stated that neither she nor the 1:1 AIDE could give the student verbal prompts to get him started and keep him focused because they were not trained special education teachers. She testified that she and the 1:1 AIDE provided the student with verbal prompts to get him started and refocus in social studies. It is noted that this contradicts her statement that she and the 1:1 AIDE were not able to give the student prompts to get him started and keep him on task. She testified that when the student requires additional assistance on learning basic facts in social studies he is sent to the resource room or the library with his 1:1 AIDE while the class moves on to other topics. She stated that the student was sent from the social studies class to the resource room for about 120 minutes per week to study basic information while the class moved on to other material. It is noted that 120 minutes per week is a significant portion of the 200 minutes per week that the social study class meets. She also testified that the student was sent to the resource room during reading/language arts to listen to books on tape when other students remained in class. Her testimony that the student is better at learning concrete information than abstract concepts is consistent with the written record [Parent Exhibit Page 282].

12. The 6th Grade Physical Education Teacher testified that the student has benefited from his education in the elementary school district. He required assistance in physical education for 6th grade because it was his first year in a new school. He receives adaptive physical consultative service. Approximately one period per month he receives direct adaptive physical education and one period of physical therapy. The student enjoys participating in sports. He is aware of whether his team won or loss but is not aware of scores. He has a 1:1 AIDE in physical education. He felt the student made progress but made no formal observations of the student nor did he chart the student's behavior or keep any other objective means of documenting the student's progress.

13. The Elementary School Social Worker testified that she facilitated the "Circle of Friends Group" the student participated in during lunch one day per week. She did not participate, observe, chart or otherwise facilitate or know what occurred with the group the other four days of the week. The group consisted of about eight other students. The Teacher Assistant (1:1 AIDE) selected the other students. They were selected on the basis of the 1:1 AIDE noticing they were eating lunch alone. The SW did not seek teacher input into the selection of the students and did not screen the students other that to ask their parent's permission to include them in the group. The group met from 6th through 8th grade with the Speech Language Therapist joined the group in 8th grade for that one period per week. Again she did not participate, observe, chart or otherwise facilitate or know what occurred with the group the other four days of the week. The 1:1 AIDE was the only district staff member to meet with the group from 6th through 8th grade for five days per week but for reasons not known to the hearing officer he was not called as a witness. The SW reported the student made progress. He presented no behavior problems in 8th grade. He initiated conversation. Other students talked to him. The students in the Circle of Friends went to each other's birthday parties. The structure of Circle of Friends was for the SW to initiate a topic of discussion such as "what did you do on the weekend" and have each student reply. She also introduced games for them to play. Her goal was to promote social interaction through spontaneous speech and believed the student made progress. However, she did not observe the student in the classroom or make formal observations of the student in other areas of the school nor did she chart the student's behavior or keep any other objective means of documenting and reporting the student's progress.

14. The 8th grade Speech/Language Therapist testified that she provided 1:1 pull out speech/language therapy to the student two periods per week (80 minutes) during his social studies class and 40 minutes of consultative service per week. She also joined the "Circle of Friends Group" in 8th grade for 40 minutes per week. The 1:1 sessions included assisting the student with articulation and helping him rehearse for oral reports to be given in his class. She did not observe the student giving oral reports in class nor did she make formal observations of the student in classes.

9

Consultation service was primarily provided to the social studies teacher and the 1:1 AIDE informally and via email. Her role in Circle of Friends was to observe the student swallow his juice and to remind him to keep the tip of his tongue at the back of his upper front teeth when at rest as recommended by the student's private speech/language therapist. She did not make formal observations of the student in other areas of the school nor did she chart the student's behavior or keep any other objective means of documenting and reporting the student's progress.

15. The 8Th grade Physical Education Teacher testified that the student participated in a regular physical education class with modifications suggested by the district's adaptive physical education teacher. The student received service from the adaptive physical education teacher one day per week during physical education and service from the physical therapist one day per week (The 2004-2005 IEP [Parent Exhibit page 150] states 80 minutes per week which would equal 2 periods per week). The student loves physical education. Other students included him in the activities. The 1:1 AIDE accompanied him but he did not need the 1:1 Aide's help in the locker room or in class. The physical education teacher felt the student made progress but made no formal observations of the student nor did he chart the student's behavior or keep any other objective means of documenting the student's progress.

16. The Elementary District Special Education Supervisor testified that she participated in IEP Team meeting for the student while he was a student within the district. She noted that the student's IEP Team meetings typically took one or more full days while IEP Team meeting for other students in the district did not take that long. The district utilizes an inclusive model for delivering special education services to students with disabilities. One of the delivery systems is a co-teaching model whereby a regular education teacher and a special education teacher teach a class composed of regular education students, special education students and at-risk non-special education students. She testified that the school the student attended adopted the co-teaching model at the insistence of the student's parents. The school adopted the co-teaching model but scheduling planning time continued to be a problem. The parent presented the district with an accommodation grid to be incorporated into the student's education when he was in 3rd or 4th grade and through 8th grade. The student was to receive a three-year evaluation in 6th grade but was provided a partial evaluation because the parents refused to allow the district to conduct a school psychological evaluation. The parents agreed to allow the school psychologist to write a report of a review of the student's prior records including a private psychological evaluation but they refused to allow the psychologist to include test scores from that psychological evaluation [Parent Exhibit pages 8-9]. The parents also prevented the elementary school district from sending the student's full special education file to the high school district for consideration in

10

developing the student's high school IEP. This testimony was not denied or rebutted by the parents.

17. While the parents did not provide the high school district a copy of the private psychological evaluation, they did, however, included the private psychological evaluation in the evidence packet submitted for the due process hearing [Parent Exhibit pages 1-7].

18. The Elementary School District Adaptive Physical Education Teacher testified that the student made progress from 6th through 8th grade. In 6th grade he needed help in the locker room. By 8th grade he was able to use the locker room without help. He could participate in all skill activities with occasional prompts and modifications. While his skills were not at the level of his peers, he could be a participant in activities. He recommended the student participate in regular education physical education with support at the high school. He observed the student in physical education but did not formally chart the student's progress or keep any other objective means of documenting the student's progress.

19. The Parent's Private Expert Witness/Advocate testified that he knew the student since pre-school and participated in the student's IEPs since primary school. He testified that the student made progress in the elementary district's co-taught program, benefited from "Circle of Friends" and the parents' accommodation list, which had been developed, by a number of educators over the year. He stated the special education teacher was able to provide direct special education service in the regular education classroom while enriching that instruction in resource room. In Circle of Friends, the student's peers meet every day during lunch to discuss how they would support the student during the school day. The 1:1 AIDE stated the high school district's proposed 2005-2006 IEP was inadequate because a resource program had not worked for the student in the past, the proposed therapeutic theater program (WTTW) was an inadequate substitute for Circle of Friends, and the district's accommodation list was lacking. He stated that the high school district's list had eliminated "providing the student help with his combination lock" and "allowing the student remove himself from stress to gain control". While the advocate offered these as failings in the high school district's accommodation list, he testified that he was not aware of whether these were still areas of need for the student. The advocate testified that he did not observe the student in 8th grade nor did he talk to the 8th grade teachers about the student nor did he know what modifications were made to the student's curriculum, instruction and grading. His description of what he called Circle of Friends was not at all like the program the elementary school provided the student from 6th through 8th grade. He did not know that rather than spending resource room time to enrich classroom activities, the special education teacher divided most of the resource room time doing non-classroom activities such as teaching the student keyboarding, listening to books on tape and working on reading

11

comprehension. Given the advocate's testimony is not credible because of his lack of knowledge of the student's 8th grade program and functioning.

20. The student's father testified that the student loves sports. The parents want the student to participate in regular physical education because it provides the student with an opportunity for social development in a natural setting. He testified that the student participated in summer sports camps, the YMCA sports program and Boy Scouts. All of these activities are with non-disabled peers of the same age as the student. The student participated fully and there have been no safety issues with his participation. He stated that the family wanted the student to have that same opportunity at the high school and if there were any question of the student's safety he would be the first to step forward to protect the student. The father did not object to the 2005-2006 IEP goals but objected to the methods proposed by the district to achieve those goals.

21. The High School Social Studies Teacher teaches the student one period of history in a two-period freshmen humanities block. The class is offered at three levels. The student is in the lowest level offered. The social studies teacher attended an in-service provided by the district for all of the student's high school teachers. He received a copy of the student's 8th grade IEP and a list of accommodations. He has had daily consultation with the student's high school special education teacher. The student had one behavioral incident in class since school started three weeks ago. The teacher asked the class to write something about themselves and share it verbally. One student stated that the she was frightened of the student. Upon hearing that, the student raised his arms and made a growling sound. Another student then stated that she too was frightened. The social studies teacher took the three students aside and resolved the issues by having the students discuss appropriate ways of dealing with feelings. There were no further repeats of that behavior or other behavior problems. So far the student is doing "OK" in humanities. The focus of the class is on literal concrete material. Work assignments have been modified, the student is provided study guides, the 1:1 aide sits next to the student, takes notes for him, prompts him to get started, stay on task, take materials out and complete assignments. Completed homework assignments are better than in-class assignments. The student got 20 out of 20 correct answers on a map quiz. The social studies teacher has difficulty understanding the student's verbal responses and interpreting his written answers. He does not know how he will grade the student but thinks it will be based upon the student's IEP in consultation with the student's special education teacher. He is concerned that, as the course requirements progress beyond recall of concrete information, the student will not be able to satisfactorily meet the expectations of the essential aspect of the humanities curriculum which focus on utilizing primary source material to draw inferences, make comparisons, differentiate fact from fiction and other critical thinking exercises.

22. The High School English Teacher testified that she attended the in-service for the student, has a copy of his 8th grade IEP and accommodation list. The student has experienced no behavioral difficulties. The 1:1 aide sits next to the student in the front of the room. He helps the student get organized, stay on task and complete assignments. Homework assignments are well done. The student was unable to write a paragraph in class but was able to write one sentence, with assistance, in class. The English teacher consults with the student's special education teacher on a daily basis. The student exhibits difficulty speaking, following class discussion and memory deficits. The English teacher will consult with the student's special education teacher regarding issuing the student a grade but at this time the student is doing failing work.

23. The High School Algebra Teacher testified that he attended the in-service for the student, has a copy of his 8th grade IEP and accommodation list. The algebra class meets eight periods per week. The student has difficulty understanding abstract concepts and keeping up with the class. The 1:1 aide assists the student by taking notes copying problems, keeping him on task and working 1:1 with the student. The algebra teacher has difficulty understanding the student's speech. The algebra teacher consults with the student's special education teacher a few times per week and corresponds by email five to ten times per week. The special education teacher has observed the student in class. Additionally the algebra teacher talks with the student's father regularly about modifications to the curriculum. The algebra teacher wants all of his students to succeed and makes accommodations for all his students He testified that he has a personal reason for going into teaching because his son has sever disabilities. The student has not exhibited any behavior difficulties in algebra class. The student has taken one quiz, which was modified and did poorly on that quiz.

24. The High School Social Worker (SW1) testified that she has worked with the student 1:1 and observed him in the special education resource room. She said that the high school district does not offer Circle of Friends during lunch because other students have a right to choose who they have lunch with. She explored the possibility of contacting the students who were in the elementary school district Circle of Friends but found that only one of the students was enrolled at the high school and that student had a different lunch period. She said the high school district has a program called WTTW which has been successful in assisting high school age student develop communication skills, social skills and relationships. A school social worker, school psychologist and speech/language therapist facilitate the program. The SW1 stated that the student would also be provided group social work service.

25. The High School Director of Special Education testified that there were six IEP Team meetings prior to the student entering high school. She said that there were so many papers that it became confusing. She testified that she inaccurately listed the DLP PE as adaptive PE on the 2005-2006

13

IEP [District Exhibit 16]. She stated that she rewrote the list of accommodations provided by the parent on a district form and included only those items that were accommodations unique to the student's needs and did not list those items that were considered best practices for all students because those are the things that would be done even if no list existed. She testified that the parents prevented the elementary school district from providing the high school district with current objective case study material. The elementary school was only able to provide the high school with anecdotal information about the student. She testified that multiple placement options were considered. The resource option was offered as an alternate to the co-teaching model that the parents were insisting upon. The resource model offered two periods of resource per day and consulting service. The parents rejected two periods of resource. The district does not list consulting service on IEPs of students receiving direct special education and related services. The district has relieved the student's special education teacher of twenty per cent of his teaching load because of substantial amount of consultation he will have to provide the student's regular education teachers. Members of the district's IEP Team recommended the student take a two-period regular education reading course, Reading 180, rather than the two-period humanities English/social studies block because all information the high school district has received indicated the student has sever difficulty with reading comprehension and reading comprehension is a fundamental skill required for all courses. There were not enough periods in the day to fit all of the student's core courses and his elective courses, therefore Reading 180 was recommended in place of English/social studies block. At an early stage in the transition process from the elementary district to the high school district, she raised the question of whether the student's special education needs might more appropriately be addressed in an instructional special education placement. She retreated from this with the parent's insistence that the student be placed in all regular education classes using a co-teaching model. The district does not utilize a co-teaching model because of scheduling difficulties it would cause in a large high school and more importantly the questionable efficacy of the model. Instead the district provided a 1:1 aide and extensive consultation support to regular education teachers within a special education resource model.

26. The student's mother testified that she did not want to go to a due process hearing but did so only after she was advised by Andy Eulass, at the Illinois State Board of Education, that she had to request a due process hearing immediately to insure the 8th grade IEP would be the student's "stay put" IEP. She stated that she and her advocate presented the elementary school with an accommodation grid. She has added to the grid as the years transpired. She stated that there is not one item on the grid, nor would she place a statement on the grid, that the educators do not agree with. It is noted this statement is in contradiction with the parents' Issue (6) and Remedy (7), which seeks to have the due process hearing

officer order the district to implement the parents' grid. The mother stated that she was not insisting that the student be placed in a co-teaching model and would accept a reasonable alternative. Again this statement is not consistent with the facts. The elementary school district personnel testified that the student was placed in a co-teaching model at the insistence of the parent. Again, Issue (3a) and Remedy 3, of this due process hearing specifically seek a co-teaching model. It is true that Issue (3b) and Remedy (4) propose a fallback position of a resource model if the parent is not successful in obtaining an order for a co-teaching model. But, the parents did not accept the district's offer to stipulate to the level of resource services that parents are requesting as a fallback position [Hearing Officer Exhibit A]. The mother testified that she was not insistent on the student receiving a "Circle of Friends" program but would accept a program with the same objectives. Again this is contradicted by the due process hearing request. In Issue (5) and Remedy (6) the parents are specifically seeking to have the hearing officer order the district to provide the student with a "Circle of Friends" program. Additionally, the parents have rejected the district WTTW program as inadequate without having experienced it. The mother testified that the student has not seen any of the students who participated in the elementary district Circle of Friends since the end of the 2004-2005 school year. Since there were no target behaviors listed for Circle of Friends program at the elementary district, or a baseline of behavior or charting of behavior and since the merits of the Circle of Friends has not been substantively verified in terms of the student maintaining friendships with members of that group or utilizing skills developed in that group to make new friends, the Circle of Friends program as the preferred program to promote the student's competency in social skill development is questionable at best. The mother testified that the parent's insistence that the student be educated within the regular education curriculum was because it was his last chance to be in a normal world. He was not going on to college. He will be entering a world of other disabled people where the world will adjust to him instead of him adjusting to the world. The high school is his last chance to learn to adjust to the demands of the real world rather than having special education adjusting the world to the student. This stated objective is inconsistent with the amount and type of modifications the parents are insisting be made in the regular education setting. The parent stated that she opposed the district's proposed reading program because it would not work. She stated that the student does not learn comprehension skills in isolation of curriculum content. Further, if the student were to be placed in a computer based reading course that was primarily designed for student with autism, he would be denied the necessary social interaction with peers. Once again there are contradictions in this conclusion. The first contradiction is that all regular education content area teachers (elementary school and high school) testified that the student's curriculum was modified to eliminate comprehension of content. Tests were modified in elementary and high

15

school to eliminate comprehension questions. All that was required of the student was the rote recall of a small portion of basic concrete facts used in the course. The goal in the elementary district as stated by the assistant principal was to expose the student to the curriculum rather than have him learn the curriculum. Further, what little information that is available on the student indicated comprehension is a major deficit area for the student and in need of direct instruction. Finally, Reading 180 is not a computer-based program designed primarily for students with autism. Additionally, once again, the parents have rejected an offering without trying or even considering it. The mother's testimony regarding the high school offerings was not factually correct. She stated that the student was in an algebra class that would not issue credit. She also stated the reading classes are special education class does not give credit. It is clear that the algebra class gives credit and the reading class gives credit. It is also clear that the reading class is a regular education class. In summary the mother did not present any objection to the 2005-2006 IEP goals for the student but objected to the methods by which the district has proposed to meet those goals. Her conclusions regarding the methods by which the high school district plans to achieve the 2005-2006 IEP goals are not supported by the facts of this case.

27. The High School Physical Education teacher testified that he observed the student at the elementary school and spoke to the school principal, students PE teacher, the 1:1 AIDE and another PE teacher. The physical education program at the elementary school differs considerably from the high school. The class did not start on time, not all students had uniforms and the activity was less structured. The activity the student was engaged in was a warm-up with the class while the 1:1 AIDE kept him focused and bouncing a basketball with the 1:1 AIDE. It did not involve play with the other students. At the high school, regular PE is fast passed and competitive. He recommended the student take Interactive DLP PE at the high school [District Exhibit 17]. The Interactive DLP is a reverse inclusion PE whereby students from regular education are included with students from special education. The regular education students must be recommended by a teacher and go through a screening process to be selected for the program. Interactive DLP PE has 30 students in the class and is taught by a female and male teacher. The curriculum replicated the general education curriculum with additional support. It can specifically address the student's IEP goals pertaining to physical strength and development [District Exhibit 24]. Additionally, Interactive DLP PE will facilitate the student's social/emotional goals because DLP students participate socially outside of the class in the lunchroom, around the school, at school events and after-school social activities. Team sports are less competitive in DLP and not as fast paced as regular PE. The teacher structures competitive team sports so that there are ties; resulting in no losers. It is noted that the parent's attorney stated that the student would not be satisfied in games that ended in ties but somehow stopping a fast

paced competitive game and giving the student an opportunity to participate briefly would be satisfying. Further, there is a question of whether the student remains focused and understands what is transpiring during a game or what the score is. The high school physical education teacher testified that the student's safety is a concern in a regular PE class because the fast pace competitive nature of regular PE along with the student's difficulty with staying focused, poor reaction time and poor coordination. It is also noted, that the student only was in a modified regular PE for two of the scheduled five periods per week because one period was reserved for 1:1 adaptive PE and two periods were reserved for physical therapy.

28. The High School Teacher Aide testified that he is with the student for all parts of the school day except for lunch and band when another Aide is with the student. He reported that he takes notes, helps the student complete assignments and cue the student to get him started and stay focused on assignments. All teachers have made modifications for the student and attempt to keep him involved in class. The student has difficulty getting started; staying focused and does not replicate the skills, and knowledge demonstrated on work completed at home in the classroom. The other students in PE accept the student and have stopped a volleyball game to let him serve. The girls in class place him in a position on the court where he is not likely to get hit. He does not follow the game and is unable to hit the ball over the net when it comes to him. Currently the boys in the student's PE class are participating in wrestling. The student has a medical waiver exempting him from wrestling so he is currently not participating in regular education PE.

29. The High School Special Education Teacher testified that he provides the student with five 43-minute periods of special education resource service per week and 120 to 150 minutes of consultation per week. Additionally he observes the student in one to two regular education classes per week. The observations enable him to provide specific direction to the regular education teacher and the student's aide. The regular education teachers, the aide and the social worker and speech/language therapist individuals confirmed his testimony that he has daily consultation with them. The speech/language therapist uses one of the student's resource periods for speech/language therapy. He testified that he uses the student's special education resource class to provide instruction to accomplish the student's IEP goals using curriculum from the student's regular education classes. The parent did not refute this testimony and renders Issue 7 and Remedy number 8 above moot. He consults with the mother every Friday as well as communicating via a daily log and assignment notebook. He has a reduced teaching load so that he can provide these extensive services to the student in support of his regular education placement. He stated the student is able to decode words but does not comprehend meaning of what he has read. He believes the student would profit from the Reading 180 program. It would address the student's reading goals and provide

him with instruction on how to use a text to access information. He testified that he modifies tests for the student, preps the student for tests and administers tests when the student requires that level of support. Grades are modified on a course-by-course basis in compliance with the student's needs and the nature of the subject. He thought this level of flexibility was better than a ridged system applied over all subjects. The grades the student received for the first 6 weeks of school were Physical Education (A), History (A), English (B), Biology (C-), Algebra (No Grade). Band (F). The grades for freshmen at this grading period are intended to reflect the freshman student's adjustment to the demands of high school. As such, a heavy emphasis is placed on students completing homework assignments characteristic of a high school. The student's grades are meaningless in this regard. It is clear the parents completed the student's homework assignments because the assignments were not only significantly better than the student produced in class but also were better than any other student produced. Further, the student was unable to demonstrate the knowledge and skills in class that were required to complete the homework assignments. Finally, the parent's attorney acknowledged the parents assisted the student with homework. While it is laudatory for parents to be involved with their child's schooling, the primary goal is not to get the homework assignment completed but for the child to learn even if that means the homework assignment will not be perfect. Further, the curriculum expectations have been so modified for the student and the assessment of the student's mastery of that curriculum have been so modified that the grades can not be used as a measure of the student's competency as compared to other freshmen. The grades were issued in consultation with the student's special education teacher in accordance with the student's IEP. The special education teacher testified that as a matter of district practice consultation service is provided to each of his resource students but is not listed on their IEPs.

30. The High School History Department Chairperson testified that she thought the student would be more appropriately placed in the Reading 180 program than the English/history course because it would provide him with foundation skills required to succeed in other courses and would more appropriately address his IEP goals. She acknowledged that initially she thought the student should be in an instructional special education program but backed off that position. It was her understanding that per parent desire the student would take more than the typical 4 years to complete high school and could take the English/humanities course later. The student would have to give up English/history because she understood the parents wanted the student to take band and biology and there were not a sufficient number of periods in the school day. She stated that as a matter of district policy, incoming students scoring below 50% on entry reading tests are required to take a reading course to improve their reading skills so that they can succeed in high school. About a quarter of

the incoming freshman take the reading course. She testified that the student does well on naming countries on a map. He has difficulty getting started on tasks and staying focused.

31. The High School English Department Chairperson testified that she also had experience teaching in the student's former elementary school. She attended 5 of the IEP meetings. She recommended the student take the Reading 180 program because it would more appropriately address the student's IEP goals and provide him with skills needed to access the high school curriculum. She stated the district did three years of research prior to adopting the Reading 180 program. The Reading 180 program was described as a diagnostic/prescriptive program that addresses the reading/writing language skill deficits individual students exhibit and is flexible enough in its implementation to compensate for the student's acquisition problems such as receptive auditory language processing problems. It should be noted there is no valid current cases study to assert what the student's acquisition deficits are or for that matter his relative strengths are. Rather, the district is dependent on old and outdated material that has been filtered by the parents as indicated in the testimony of the Elementary District Special Education Supervisor above. The High School English Department Chairperson acknowledged that initially she thought the student should be in an instructional special education program but backed off that position. Like the High School History Department Chairperson, it was her understanding that per parent desire the student would take more than the typical 4 years to complete high school and could take the English/humanities course later. The student would have to give up English/history because she understood the parents wanted the student to take band and biology and there were not a sufficient number of periods in the school day. She testified that the Reading 180 is a regular education course taught by regular education teachers with regular education students and grants regular education credit to students. She also testified that the English class does not provide direct instruction in reading where as the Reading 180 program does. Again she, like the High School History Department Chairperson, is concerned that while the student is able to participate in the class activities that are more concrete exercises to prepare freshmen for the demands of high school she is concerned that there will not be a sufficient amount of the curriculum available for the student to be meaningfully involved with as the curriculum material becomes less memorizing and rote recalling of fact and more abstract with the intent of having student utilize and further develop cognitive process such as making inferences, comparisons, synthesis, interpretations and applications.

32. The High School Psychologist testified that he reviewed the student's records and observed the student in the biology and history classes. He first saw the student's private psychological evaluation after it was submitted into evidence for the due process hearing [Parent Exhibit pages 1-7]. It is noted that page 1 of the private psychological evaluation states

that the elementary school district had conducted prior psychological evaluations that were not made available. The only record submitted to the high school district for the 2005-2006 IEP meetings consisted of a review of the student's record as screened by the parents. It is noted that the private psychological makes reference to the elementary district's psychological evaluations but those evaluations were also not available. The private psychological evaluation indicates the student's cognitive functioning on the tests administer are consistent with prior assessments and falls within the mild range of mental retardation. The parent obtained the private evaluation because of a dispute with the elementary district over the district's conclusion that the student was eligible for special education services under the criteria of mental impairment [Parent Exhibit page 6]. The high school psychologist testified that he consults with the special education teacher several times per week. He testified the student would benefit from Reading 180 because it addresses his needs and the student has demonstrated he can profit from direct reading instruction because his reading scores have increased.

33. The High School Social Worker/Lead Teacher provided testimony regarding WTTW, a program offered to address the student's social interaction deficits. The program meets 3 times per month for 43 minutes per session. The sessions are rotated so that the student's do not miss the same class. It is designed for a maximum of 30 students of whom 15 demonstrate a lack of social interactive skills. The other 15 student volunteers are selected by a screening process and teacher recommendations for their social interactive skills and commitment to helping their peers. A school social worker, a school psychologist, a school counselor and one to two speech/language pathologists facilitate the program. The program involves modeling and rehearsing appropriate behaviors. The program has been in operation for several years and has demonstrated that students and student volunteers meet socially as peers outside of the WTTW sessions. They have lunch together, meet informally in and around school, go to after school events and non-school events. The High School Social Worker/Lead Teacher recommended WTTW because she believes it addresses the student's IEP goals. It is noted that the objective and methodology of WTTW is similar to those of Circle of Friends.

34. High School Biology Teacher testified that the student's curriculum, tests and grading are modified as requires in the student's IEP. The student's 1:1 aide assists the student in getting started, staying on task and completing assignments. The student partners with another student who also assists the student. The student was able to do a microscope assignment and construct a model of a helium atom with assistance. The student is learning. He does not require the assistance of an occupational therapist in biology class. The teacher consults with the student's special education teacher on a daily basis and there is no need for a co-teacher.

20

35. High School Speech/Language Pathologist testified that she developed the speech/language goals on the student's IEP in consultation with the student's mother, private speech/language pathologist and the elementary school speech/language pathologist. The mother agreed with the speech/language goals. The student's 2005-2006 IEP provides another 43 minutes 3 times per month through WTTW. She stated the WTTW would facilitate the student's spontaneous social speech development. She stated WTTW was offered to the student but he is not participating because the parents have not permitted it. She testified that Reading 180 would assist the student achieve speech/language goals by increasing his language acquisition and comprehension skills. She uses terms from his biology and history class to assist him with articulation skills. The student currently receives 43 minutes per week of speech/language service in the classroom setting, 43 minutes per week of speech/language pullout service and 43 minutes per week of speech/language consultation with the student's special education and other teachers. The consultation service is not listed on the student's IEP but he benefits from that service. It would be appropriate to list consultative S/L service on the student's 2005-2006 IEP. It is her opinion that the student does not require additional speech/language service.

36. Testimony of the elementary district personnel indicates the student's multiple disabilities are manifested in a school setting in a number of ways including a difficulty in: articulating speech; the reception, processing and expression of spoken and written language, the facility of cognitive functioning to access academic learning beyond memorizing and recalling basic factual data and interacting socially with peers with the assistance of a teacher or 1:1 aide, a lack of physical strength and a lack of coordination. The student's special education placement in the elementary school district was called an inclusive co-taught placement. However its objective was merely to expose the student to the regular education curriculum rather than have him benefit from the richness of the general education curriculum by having him participate and learn that curriculum with his non-disabled peers. In fact the testimony indicates that much of the time the student was sent from the regular education classroom back to the resource room when the regular education curriculum involved more than memorizing and recalling basic facts of a content area. The testimony indicates the student's curriculum was not to memorize all of the basic facts but only a limited portion of the facts. The testimony indicates the student required the special education teacher and/or the 1:1 aide to provide direct instruction to get him started on a task, stay focused on that task and complete the task. There was no indication that the special education teacher provided a qualitative or quantitative different level of service in the regular education classroom than the 1:1 aide. Specifically, there is no indication that the student received any more benefit from the classes that were co-taught than those that were not co-taught.

37. The high school director of special education, English department chairperson and history department chairperson all thought the student required an instructional special education placement at the onset of the 2005-2006 IEP process but moved off that mind set to construct a special education resource program for the student. The parents also started the 2005-2006 IEP process with a pre-determined mind set of what the student required in terms of special education placement, amount and type of related services, gender of the 1:1 aide, course selection, curriculum modifications, methodology and grading. They did not move off their opening position and have done everything in their power to obtain their objective including placing evidence into the due process hearing record that was withheld from the 2005-2006 IEP team

## Conclusion of Law and Discussion:

The parents and the elementary school district personnel maintain the student benefited from his elementary district special education placement. This hearing officer is not going to comment on that conclusion because it is not germane to this due process hearing. The parents and elementary school district personnel characterize the student's special education placement in 8th grade as an inclusive co-taught special education placement. The hearing officer is required to comment on that characterization because the parent is seeking to have that placement replicated in the high school district. As indicated in Findings of Fact 10 & 11, characterizing the placement as co-taught is a stretch because the special education teacher was with the student in only two of his regular education classes and would pull him out to go back to the special education resource room when the regular education teacher presented curriculum content that required cognitive skills beyond memorization and recall or when the student needed additional practice memorizing facts while the regular education students received a richer more abstract and complex curriculum. As indicated in Findings of Fact number 36, the regular education curriculum was modified to such an extent, the student received such extensive 1:1 direct instruction during the time he spent in the regular education class and was sent from the regular education class back to the special education resource room that his special education placement would be more accurately characterized as a special education instructional placement that is delivered partially in regular education classroom for a variable amount of time on a daily basis.

Testimony of the high school district (district) personnel as supported by the written record indicates the district fully complied with the requirements pertaining to transferring students and 'stay-put' as stated in Findings of Fact 6. The testimony and evidence indicates the district is making a good faith effort to provide the student with a special education placement in an inclusive setting. While the special education teacher is not co-teaching two of the student's regular education classes, the student is not being pulled out of those classes and sent back to the special education resource room on a daily basis. In that respect, the high school district placement has been more inclusive than the

22

elementary school district placement. The district's special education is providing more classroom observation and more consistent consultation to all of the student's teacher as well as supervision to the 1:1 aide that provided in the 8th grade placement. The district has clearly provided the student with extensive aids and supports in the regular education classroom in compliance with the regulations [*34 CFR 300.550(b), 300.552(b)(2)*]. It remains to be seen whether the regular education curriculum has to be so extensively modified that it is altered beyond recognition [*Lachman v. Illinois State Bd. of Educ., 441 IDEELR 156 (EHLR 441:156) (7th Cir. 1988)*] and if so whether the inclusive placement constitutes FAPE for this student. This is not an issue before this hearing officer and is better left to a duly constituted IEP team.

This hearing officer is, however, required to determine whether the student's proposed 2005-2006 IEP or the stay put IEP with adjustments identified by the parents constitute FAPE and LRE for the student.

**1. Whether the district's proposed special education placement in a two-period regular education reading class and adaptive physical education as opposed to a two-period English/history block and physical education in regular education classes, provides the student with a free appropriate education in the least restrictive environment.**
The standard test of FAPE is the Rowley two-prong test. Rowley does not provide guidance for LRE but Beth B. is applicable. After 6 IEP meetings totaling 20 or more hours there is no question about the parent's participation in the development of the student's IEP. The district exceeded the expectations of the first prong of Rowley. With respect to the second prong, there is no dispute over the goals of the 2005-2006 IEP. The issue comes down to whether the proposed Reading 180 program and Interactive DLP are more restrictive than the English/history block and regular PE class.

The parent contends that the Reading 180 program is a special education class. This simply is not true. The parent states the Reading 180 program does not award credit. This is not true. The parent states Reading 180 is designed for children with Autism who lack social skills. This is not true. The parent states the Reading 180 is a computer driven program that relies heavily on auditory input. This is not true. The parent's characterization of Reading 180 being a district special education program is contrary to the fact that the program is taught by regular education teachers, has regular education students, awards regular education credit and is presented to the community as a regular education program. To claim that a program designed to provide instruction to students requiring assistance in reading is a special education program flies in the face of *IDEA 2004 Sec. 16(b)(5)(A)* which specifically excludes students who lack appropriate instruction in reading from special education eligibility. Finally, all of the student's past and current teachers testified that the student has deficiencies in reading and the student was enrolled in a reading class in his 8th grade placement. Most important, while the Reading 180 program and the

23

English/history block are both regular education courses, the quality of services in Reading 180 are significantly greater for this student than the English/history block and more appropriately address the students IEP goals pertaining to reading and warrant placement in the Reading 180 program [*34 CFR 300.552(d)*]. Since the Reading 180 program and the English/history block are both regular education courses, the question of LRE with respect to this issue is moot.

Likewise the Interactive DLP PE as described in Findings of Fact 27 is a reverse inclusion program that will more appropriately address the student's 2005-2006 IEP goals pertaining to his physical and social needs. The parents state that the student participated in a regular education PE class in 8th grade. This assertion is not misleading. He only participated in two of the 5 days assigned to PE per week. The remaining two periods of PE were considerably modified in consultation with the adaptive PE teacher and with considerable assistance from the 1:1 aide. The Interactive DLP by contrast would have the student participate in PE with specially screened and selected regular education students. The objectives and structure of Interactive DPL PE would facilitate the student's social interaction in the PE class as well as during lunch period, in and around school, at after school events and non-school events while more appropriately addressing his IEP goals pertaining to his lack of physical strength, development and coordination. Again the quality of service available in the Interactive DLP PE and the amount of interaction with non-disabled peers is significantly greater than the regular PE class and warrants finding a placement in the Interactive DLP PE class for this student is more appropriate than the regular PE class [*34 CFR 300.552(d)*].

The district has demonstrated that a placement in the Reading 180 program and Interactive DLP PE is calculated to provide the student with educational benefit. The district has satisfied both prongs of the Rowley [*Rowley v. Board of Education, 553 IDELR 656 (EHLR 553:656)(U.S. 1982)*].

Additionally, since the Interactive DLP PE has reverse mainstreaming that provides the student with a greater opportunity to obtain a more appropriate education by fully participating in all class activities and to interact more meaningfully with non-disabled peers, the Interactive DPL PE represents the least restrictive class for the student. The high school physical education teacher, who is the on-site expert in this matter, testified that the student's safety is a concern in a regular PE class because the fast pace competitive nature of regular PE along with the student's difficulty with staying focused, poor reaction time and poor coordination. The courts have given deference to the on-site expert opinion in matters pertaining to the delivery of services to students. While there is no question that the parents are concerned about the student's safety, they are not in a position to judge the safety concerns presented in a regular physical education class nor are they in a position to waive the student's right to be educated in what constitutes a safe educational setting for him. It would

24

present a potential danger to the student and therefore be foolhardy for this hearing officer to disregard the expert opinion of the on-site physical education teacher. Finally, all of the testimony from elementary and high school district personnel indicates the regular physical education class has to be altered to such an extent that it is in actuality not a regular education class for the student and that the Interactive DLP PE class is a more appropriate class for the student. [*Beth B. v. Lake Bluff School District, 35 IDELR 150 (7th Cir. 2002)*]

For the aforementioned reasons, placement in the Reading 180 program and Interactive DLP PE as specified in the 2005-2006 IEP provides the student with a free appropriate public education in the least restrictive environment.

For the aforementioned reasons, the parents' request that the hearing officer find that a free appropriate public education in the least restrictive environment constitutes a two-period English/history class block and physical education in the regular education for this student and to order the district to provide such as opposed to the two periods of reading in regular education and adaptive physical education proposed by the district in the student's 2005-2006 IEP is denied.

**2. Whether the district is required to specify the criteria that will be used to issue grades to the student for his courses in his 2005-2006 IEP.**
There is no statutory, regulatory or case law, which requires a local school district to specify the criteria that will be used to issue grades on an IEP. Therefore a due process hearing officer lacks authority to order a district to specify the criteria by which grades will be issued on the IEP. In this instance the 2005-2006 states grades will be modified. The special education teacher testified that the grades have been modified on a class-by-class basis in conformity with the student's IEP goals. The issuance of grades is one of those matters the courts have in their wisdom left to the professional discretion of local educators.

Since grades are an indicator for parents of the local educator's assessment of the student's relative mastery of some requirement and since the parent's receive daily reports via the student's daily log book and assignment book as well as weekly meetings with the student's special educator, this issue is moot.

Finally IDEA 2004 does not explicitly require the district to specify the criteria for issuing grades *IDEA 2004 Sec. 614(d)(1)(A)(VIII)(ii)*.

There is no legal foundation for ordering the district to specify the criteria that will be used to issue grades to the student for his courses in his 2005-2006 IEP.

For the aforementioned reasons, the parents' request that the hearing officer order the district to specify, in the 2005-2006 IEP, the criteria by which grades will be issued to him for his courses is denied.

**3. Whether the student's 2005-2006 IEP provides sufficient supplementary aides and services, program modifications, and supports for school personnel to educate the student in the regular classroom using appropriate qualified personnel.**

> **a) Whether the district must provide a special education teacher to co-teach the student's regular education classes.**
>
> **b) Whether the district is required to provide and specify 172 minutes per day of consultative service from the special education teacher to the regular education teacher and stipulate, in the student's 2005-2006 IEP, the means by which the special education teacher will assist the regular education teacher modify assignments, assess student progress and preview instructional materials to discuss instructional techniques for those materials.**

The parents are seeking to have the hearing officer order the district to provide the student with co-teaching in the regular education classes. If that is not achievable they desire the hearing officer to order the district to provide the student with 172 minutes per day of consultative services. They since sought to amend the latter remedy less than 14 days prior to the due process hearing. The district offered to stipulate to the level of service the parent was seeking in their amendment but the parent refused to accept the stipulation holding out for the possibility of obtaining an order for co-teaching. The parent's request to amend the remedies was denied. At the conclusion of the 4th day of due process hearing the parent submitted a request to reconsider the ruling denying the original request to amend the remedy. The request to reconsider will be addressed first.

The parent's request for a reconsideration of the due process hearing officer's September 6, 2005 ruling which denied the parent's request to amend amendment to issues 3(a) and 3(b) and remedies (3) & (4) of the due process hearing less than 14 days prior to the start of the due process hearing. The request was made on September 6, 2005 and the due process hearing was Scheduled to start on September 12, 2005. The district offered to resolve the issue by writing into the IEP the number of minutes of consultation service the special education teacher was actually providing the student and the classroom observations the special education teacher was making but the parent rejected the district's offer.

Since IDEA 1997 requires the pre-hearing conference at which time the issues and remedies are set occur not less that 14 days prior to the due process hearing and since IDEA 2005 does not allow amendments of the request for a due process hearing the parent's request to amendment to issues 3(a) and 3(b) and remedies (3) & (4) of the due process hearing was denied [Hearing Officer Exhibit A]. The parent submitted *735 ILCS 5/2-617* [Parent Exhibit B] to request are consideration of the hearing officer's earlier ruling. Essentially the parent

26

argues that if the parent as the plaintiff prevails in its accretion that the district has not provided FAPE it should not be penalized for seeking the wrong remedy. There are several factors that undercut the parent's position. First, *735 ILCS 5/2-617* does not apply to due process hearings and is contrary to *105 ILCS 5/14-8.02(g)(2)* which does pertain to special education and requires that remedies be disclosed 14 days prior to the due process hearing. More importantly, the requirements of IDEA take precedence over ILCS. Finally, as indicated below, the parents did not prevail on issue 3(a) and 3(b).

The testimony of the elementary school district personnel indicates the educational benefit derived by the student in his co-taught classes was not significantly different than his classes that were not co-taught. The issue of co-teaching is clearly an issue of methodology and a matter the courts have deferred to the professional judgment of the local educators this pertains to methodology, which the courts have ruled is a matter best left to the professional judgment of the local educational experts [*Lachman v. Illinois State Bd. of Ed., 441 IDELR 156 (EHLR 441:156)(7th Cir. 1988)]* Therefore the co-teaching issue is moot.

For the aforementioned reasons, the parents' request that the hearing officer order the district to amend the 2005-2006 IEP to assign a special education teacher to co-teach the student's regular education classes is denied.

By way of the parent's two attempts to amend the request for a due process hearing that would reduce the minutes of special education consultation from 172 minutes per day to 120 minutes per week indicates the 172 minutes per day is excessive. Further, the district has been providing 120 minutes per week of special education consultation service. This substantively is what the parents' amendment seeks to obtain and all district personnel testified that 120 minutes per week of special education consulting service was adequate. The parents do seek to allocate the 120 minutes in 30 minuet blocks to each regular education teacher. This would provide a level of rigidity and infringe upon the professional discretion of the educators delivering the services. Once again *Lachman* is the controlling authority over methodology in the Seventh Circuit.

For the aforementioned reasons, the parents' request that the hearing officer order the district to specify in the student's 2005-2006 IEP and to provide 172 minutes of consultative service per day from the special education teacher to the regular education teacher and specify, in the student's 2005-2006 IEP, the means by which the special education teacher will assist the regular education teacher modify assignments, assess student progress and preview instructional materials to discuss instructional techniques for those materials is denied.

Distinct witnesses have testified that as a matter of practice the district does not list consultation service on IEPs of students receiving direct service. Special education consultation service is a significant portion of this student's special

education placement and should be listed on the 2005-2006 IEP *IDEA 2004 Sec. 614(d)(1)(A)(IV)*. It is important to note this technical error did not substantively deprive the student of educational benefit because the district provided special education consultative services to the student *IDEA 2004 Section 615(f)(3)(E)(ii)*.

Therefore the student's 2005-2006 should list 120 minutes per week of special education consulting service as the district stipulated in its offer of September 9, 2005. In anticipation that there may be a question of whether the parents prevailed on this issue, they did not. Their amendment was not allowed because of failure to file in a timely manor and because the district was substantively providing what they were seeking via the amendment.

## 4. Whether the student requires an additional 43 minutes per week each of social work and speech/language consultative services to his regular education teachers.

Testimony of the high school district personnel indicated the student is receiving social work and speech/language consultative services and those services are beneficial to the student. They also testify that the student does not require additional services than those currently provided. The speech/language therapist testified that she provides 43 minutes per week of consultative service. As with number 3 above, not listing the social work and speech/language consultative services that the student is currently receiving and will continue to receive on the 2005-2006 IEP is a technical error and those consultative services should be listed with the number of minutes per week currently provided on the 2005-2006 IEP *IDEA 2004 Sec. 614(d)(1)(A)(IV)*. It is important to note this technical error did not substantively deprive the student of educational benefit because the district provided social work and speech/language consultative services to the student *IDEA 2004 Section 615(f)(3)(E)(ii)*.

## 5. Whether the district is required to implement the specific program, "Circle of Friends" requested by the parents to facilitate and promote the student's ability to interact with peers in a non-classroom setting with 43 minutes per week of direct social work service.

The district has offered to provide the student with an alternative group experience to Circle of Friends in the form of WTTW. The two programs approximate each other in terms of objectives, facilitation by professional personnel and activities. However, all of the evidence indicated the WTTW program is superior to the Circle of Friends program. The elementary school district 1:1 aide selected the students participating in Circle of Friends on the basis that all of them were socially isolated during lunch period. In WTTW, half of the student are recommended and screened for their social skills and commitment to assisting their peers. If social integration and social skill development in a non-classroom setting is one of the goals of the group experience, that goal is more likely to be achieved with students who have and exhibit those skills than socially isolated students. Additionally, testimony by

28

district personnel indicates the regular education peer volunteers extend socialization beyond WTTW during the school day, after school activities and non-school activities. In this way WTTW more closely approximates an inclusion program than Circle of Friends. The parents have rejected WTTW.

Finally this issue pertains to methodology. The courts have ruled is a matter best left to the professional judgment of the local educational experts [*Lachman v. Illinois State Bd. of Ed., 441 IDELR 156 (EHLR 441:156)(7th Cir. 1988)*]

For the afore mentioned reasons, the parents' request that the hearing officer order the district to implement "Circle of Friends" with an additional 43 minutes per week of direct social work service to facilitate and promote the student's ability to interact with peers in a non-classroom setting is denied.

**6. Whether the district is required to implement the list of accommodations provided by the parent, as opposed to the list developed by the district, in the student's 2005-2006 IEP.**
This pertains to methodology, which the courts have ruled is a matter best left to the professional judgment of the local educational experts [*Lachman v. Illinois State Bd. of Ed., 441 IDELR 156 (EHLR 441:156)(7th Cir. 1988)*]

Finally IDEA 2004 does not explicitly require the district to list the accommodations the parents are herein requesting be listed on an IEP *IDEA 2004 Sec. 614(d)(1)(A)(VIII)(ii)*.

For the aforementioned reasons, the parents' request that the hearing officer order the district to implement the list of accommodations provided by the parent and include that specific list, as opposed to the list developed by the district, in the student's 2005-2006 IEP is denied.

**7. Whether the district must use the student's special education resource class to provide instruction to accomplish the student's IEP goals using curriculum from the student's regular education classes.**

This is a moot issue because the uncontested testimony of the student's special education teacher as indicated in Findings of Fact 29 demonstrates the special education teacher uses content from the regular education curriculum to accomplish the student's IEP goals.

Additionally this pertains to methodology, which the courts have ruled is a matter best left to the professional judgment of the local educational experts [*Lachman v. Illinois State Bd. of Ed., 441 IDELR 156 (EHLR 441:156)(7th Cir. 1988)*]

For the aforementioned reasons, the parent desires the hearing officer order the district to use the student's special education resource class to provide

29

instruction to accomplish the student's IEP goals using curriculum from the student's regular education classes is denied.

**8. Whether the district must provide the student with an additional 43 minutes of direct speech/language service per week to work on expressive language in a non-classroom setting.**
The district has offered the student an additional 43 minutes three times per month of social work and speech/language service through its WTTW program. The parents rejected that offer. The testimony of district personnel is that WTTW will adequately address the student's IEP goals. By refusing the social work and speech/language services offered by the district, the parents in effect relieved the district of its responsibility to provide those related services IDEA 2004 Section 614(a)(1)(D)(i)(II). Further, once again, *Lachman* is controlling because this is a matter of the method by which service is delivered.

For the afore mentioned reasons, the parents' request that the hearing officer order the district to provide the student with an additional 43 minutes of direct speech/language service per week to work on expressive language in a non-classroom setting is denied.

**9. Whether the district may conduct a new functional analysis of behavior and revise the behavior intervention plan, if appropriate, after the new school year (2005-2006) has begun.**
The parents stipulated on the first day of the due process hearing that they were in agreement with the district to commence an analysis of the student's functional behavior no earlier than October 3, 2005 and to develop with the parents a behavior intervention plan no later than November 11, 2005 unless mutually agree upon by the parties. Therefore there is no need to rule on this issue.

Based upon the facts of this case, applicable statutes, regulations and controlling case law in the Seventh Circuit it is the finding of this due process hearing that the district by way of the student's 2005-2006 IEP has provided him with a substantive opportunity to obtain a free appropriate public education in the least restrictive environment IDEA 2004 Section 615(f)(3)(E)(i).

## Order:
The following orders are warranted based upon the facts of this case and applicable law:
1. The district shall correct the following technical errors on the student's 2005-2006 IEP and send a copy of that IEP to the parents by certified mail no later than two (2) school days after receipt of this order:
    a. Change "adaptive PE" to read "Interactive DLP PE".
    b. List the number of minutes per week of special education consultative services the student is currently receiving.

      c. List the number of minutes per week of social work consultative services the student is currently receiving.
      d. List the number of minutes per week of speech/language consultative services the student is currently receiving.

2. The district shall implement the student's corrected 2005-2006 IEP no later than five (5) school days after receipt of this order. Specifically,
      a. The district shall transfer the student from the English/social studies block to the Reading 180 class.
      b. The district shall transfer the student from the regular PE to Interactive DLP PE.
      c. The district shall enroll the student in WTTW.

3. The district shall have completed an assessment of the student's functional behavior and hold an IEP team meeting to develop a behavioral intervention plan for the student no later than November 11, 2005 unless mutually agree upon by the parties.

4. The district shall provide the Illinois State Board of Education with proof of compliance with the above orders no later than November 18, 2005.

## Right to Request Clarification:
Section 14-8.02a(h) of the School Code, allows the hearing officer to retain jurisdiction after the issuance of his or her decision for the sole purpose of considering a request for clarification. A request for clarification must be submitted in writing to me within five (5) days after receipt of the decision. The request for clarification shall specify the portions of the decision for which clarification is sought and a copy of the request shall be mailed to the other parties and to the Illinois State Board of Education. The request shall operate to stay the implementation of those portions of the decision for which clarification is sought. I shall issue a clarification of the specific portion of the decision or issue a partial or full denial of the request in writing within ten days of receipt the request and mail copies to all parties to whom the decision was mailed.

## Finality of Decision:
This decision shall be binding upon all parties.

## Right to File Civil Action:
Any party to this hearing aggrieved by the final decision has the right to commence a civil action with respect to the issues presented in the hearing. Pursuant to 105 ILCS 5/14-8.02(i), that civil action shall be brought in any court of competent jurisdiction within 120 days after this decision was mailed.

## Date of Decision and Order:
This Decision and Order rendered this 28th day of October 2005

James A. Wolter, EdD
Impartial Hearing Officer

31

IN THE MATTER OF:

**In the matter of: John M     vs. Evanston Twp H S Dist 202**
**ISBE Case Number 004568**

### Certification of Service

The undersigned hearing officer certifies that he has served copies to the aforesaid Decision and Order upon the parties of this action and the Illinois Sate Board of Education at their stated addresses by depositing with the United States Postal Service with postage prepaid return receipt.

Charles Stone, Esq.
Suite 810
79 W. Monroe
Chicago, Il 60603

Patricia Whitten, Esq.
Franczyk Sullivan
Suite 3400
300 S Wacker Dr.
Chicago, Il 60606

Andrew Eulass, Esq.
Due Process Coordinator
Procedural Safeguards Unit
Illinois State Board of Education
100 North First Street
Springfield, Il 62777-0001

James A. Wolter, EdD
Impartial Hearing Officer

32